**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| LOUIS FITZIG, | ) | |
| | ) | |
| Fitzig, | ) | Civ. Action No.: 18-2552 (RDM) |
| | ) | |
| v. | ) | |
| | ) | |
| Alejandro Mayorkas, Secretary | ) | |
| Department of Homeland Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Fitzig is Black, of mulatto coloring, and has participated in prior protected activity and has been employed by the United States Secret Service since March 1998. He has a strong work history with no hint of issues related to his performance or conduct. After his successful 19-year tenure as a GS-13, Fitzig applied, and was qualified, for five different promotional positions: three within the Forensic Services Division (FSD), one in the Newark Field Office, and one in the Special Operations Division, Airspace Security Branch. Despite his qualifications and history at the Agency, Fitzig was never asked to interview for any of these positions.

After discovering that the ultimate selectees for each of these vacancies at issue were white Caucasian and had no prior protected activity, Fitzig came to believe that his non-recommendations for selection and non-selection for these positions was motivated by racial bias and/or retaliatory animus for his prior EEO activity. Accordingly, Fitzig filed a claim for discriminatory non-selection with Defendant's OEO. Discovery obtained through the EEO process

showed that Defendant treated Fitzig's experience and qualifications differently from the experience of the ultimate selectees. Fitzig's extensive experience was minimized and criticisms of his judgment were heavily exaggerated or invested with importance after the fact, while the selectees' accomplishments were inflated and their misdeeds and negative reputations papered over by the selecting officials.

Defendant has repeatedly and tellingly emphasized that it is not bound by any objective criteria when making promotional decisions, and certainly not by the objective criteria designed to single out the best qualified applicants and to ensure merit wins out over favoritism and bias—criteria that would have favored Fitzig over the selected party for each of the five positions in question. Unbound by objective criteria, Defendant is free to concoct any number of plausible narratives to retroactively justify its actions. But such arbitrary, after-the-fact justifications are not worthy of credence, much less capable of satisfying Defendant's burden at the summary judgment stage.

The qualities Defendant claims its selectees possessed and that Fitzig allegedly lacked are the primary—though by no means sole—material facts in dispute in this matter. Defendant has adduced 390 facts it regards as material and not in dispute. *See* Defendant's Statement of Material Facts to Which there is no Genuine Issue ("Def.'s SOF"). The notion that none of these material facts is in dispute is unworthy of credibility not only on its face, but also as examined, as the discussion below will indicate. Yet Defendant seeks to end this suit prior to trial on the mistaken assertion that there are no disputed issues of material fact. The record is rife with dispute sufficient to defeat Defendant's motion for summary judgment because there are issues of disputed fact that are ripe for a jury to decide. Accordingly, Fitzig respectfully requests that the Court deny Defendant's motion and set a schedule for trial.

## II.     MATERIAL FACTS

Due to the extensive number of material facts adduced by each party in this case, Fitzig incorporates by reference the Defendant's Statement of Material Facts to Which there is no Genuine Issue and Fitzig's Statement of Genuine Issues ("Def.'s SOF"), Plaintiff's Responses Thereto, and Plaintiff's Statement of Genuine Issues ("Pl.'s SOF") (Combined as Ex. 1).

## III.     STATEMENT OF THE CASE

### Background

From March 1998 to present, Fitzig, Louis Fitzig, has worked for the United States Secret Service. ROI at 7. From March 1998 to August 2002, Fitzig completed his Phase I assignment at the New York Field Office (NYFO), during which time he held leadership responsibility as a designated Group Leader in the Bank Fraud Squad. ROI at 134. From August 2002 to January 2007, Fitzig completed Phase II assignments on the Presidential Protective Division (PPD). ROI at 134. From January 2007 to December 2007, Fitzig completed a post-detail protective assignment in the Special Operations Division/Airspace Program (SOD/ASB), during which time he held leadership responsibility as a designated Whip. ROI at 134. Following his completion of a 14-week polygraph examiner certification training at the Defense Academy for Credibility Assessment (now referred to as "NCCA"), Fitzig was assigned to the Washington Field Office (WFO) from April 2008 to July 2020, where he worked as a Phase III GS-13 Special Agent, Criminal Investigator, under the Office of Investigations, Forensic Services Division, Polygraph Program. ROI at 117. From April 2013 to July 2018, Fitzig was a Backup to the Assistant Special Agent in Charge (ASAIC) of the RPS squad at WFO, overseeing a group of polygraph examiners. This was a leadership position, and Fitzig successfully performed all of the duties and

responsibilities related to the position, including serving as a liaison between Polygraph Operations at headquarters and the WFO. In his capacity as Senior Polygraph Examiner, Fitzig provided mentorship and guidance on a daily basis to a staff that ranged in size from two to four junior polygraph examiners. Compl. ¶ 19. Fitzig has repeatedly been commended for the quantity and quality of the polygraph exams he administers and was repeatedly awarded the "Century" award for administering at least 100 polygraphs during a 12-month rating period, an award given at the annual polygraph conference. ROI at 359 (the performance evaluation, dated 7/19/17, reflects "SSA Fitzig continues to lead the Polygraph Program in numbers of polygraph exams conducted and protection assignments volunteered"); ROI at 360 (the performance evaluation, dated 7/19/17, reflects "SSA Fitzig conducted over 110 pre-employment polygraph examinations and was able to elicit conclusive results and relevant information at consistently high percentages."); Loveridge Dep. 26:1-27:8.

**Fitzig's Protected Activity**

Fitzig contacted an EEO counselor for the first time on January 27, 2017 in relation to previous non-selections for positions within the New York Field Office. ROI at 113. During this meeting, Fitzig engaged in pre-complaint counseling. ROI at 34. Although Fitzig chose to remain anonymous, in February of 2017, as the result of an Inspection investigation Fitzig learned that his emails were under review, including his emails regarding his anonymous EEO activity. ROI at 122, 133. Frank Loveridge, as SAIC of the Forensic Services Division, and Kenneth Jenkins, Assistant Director of the Office of Investigations, would have been told about this complaint. Ex. 5, Fitzig Decl. ¶ 7.

At all relevant times, Daniel Ciatti (white, Caucasian), the management official who gave input to Loveridge, recommending official for Vacancy Nos. 17116, 17157, and 17165, was aware

of Fitzig's prior protected activity. As a result of an Inspections investigation that included a review of Fitzig's work emails, his correspondence with EEO regarding his December 2016 non-selections were uncovered. ROI at 122, 133. At all relevant times, Brian Leary (white, Caucasian), the management official who gave input to Loveridge, recommending official for Vacancy Nos. 17116, 17157, and 17165, was aware of Fitzig's prior protected activity. As a result of an Inspections investigation that included a review of Fitzig's work emails, his correspondence with EEO regarding his December 2016 non-selections were uncovered. ROI at 122, 133. At all relevant times, Frank Loveridge (white, Caucasian), the recommending official for Vacancy Nos. 17116, 17157, and 17165, was aware of Fitzig's prior protected activity.

**Fitzig's Race and Color**

Fitzig is Black man of mulatto coloring. Compl. ¶ 1. It is evident from Fitzig's appearance that he is neither white nor Caucasian. Fitzig Dep. 104:5-9, 106:22-25, 107:2-4, 242:11-14; Ex. 3, Alston Decl. ¶ 4; Ex. 4, Lewis Decl. ¶ 9; *see also* ROI at 189-90 (DAD Breslin noting that he assumed that Fitzig is biracial). Others tend to assume Fitzig is Black, Hispanic or mulatto. Fitzig Dep. 242:15-20; *see* ROI at 189-90. Leary was aware of Fitzig's race and color prior to his involvement with the administrative EEO process. Fitzig had a conversation with supervisors Brad Beeler and Brian Leary between November 2 – 3, 2016 regarding an audio review they had conducted. During Fitzig's conversation with Beeler and Leary, Fitzig was informed that they were surprised to learn (after listening to the audio) that Fitzig is biracial (Black mulatto), and was the product of an interracial marriage. Fitzig Dep. 102:19-104:10.

Loveridge was aware of Fitzig's race and color when he made recommendations for Vacancy Nos. 17116, 17157 and 17165. Loveridge described himself as a "highly observant person." Loveridge Dep. 30:8-10. Loveridge and Fitzig worked in the same office in 1998,

overlapped on the Presidential Protective Division, and then worked together for almost three years from June 2015 until Loveridge's retirement in March 2018. Loveridge Dep. 20:14-22; Ex. 5, Fitzig Decl. ¶ 8. In addition to Loveridge's ample opportunities to observe Fitzig's race and color in the professional settings in which they encountered each other over the twenty years they knew each other, Fitzig and Loveridge encountered one another in social settings during which Loveridge's penchant for telling off-color jokes involving race or ethnicity would have put Loveridge on notice as to Fitzig's race and/or color. Fitzig Dep. 105:12-106:17. Moreover, as a general matter, people in law enforcement tend to know each other's backgrounds. Fitzig Dep. 104:14-22; Ex. 5, Fitzig Decl. ¶ 8. Ciatti was aware of Fitzig's race because he had previously confronted him about being held to a different standard than several junior white polygraph examiners regarding his continued exclusion from professional development as a mentor and evaluation of his performance as a polygraph examiner. Ex. 4, Lewis Decl. ¶¶ 11-13.

### Fitzig's Performance

For Fitzig's 2016 Final Rating, Ciatti, Fitzig's first-line supervisor, initially gave Fitzig ratings of "Exceeded Expectations" in the Teamwork and Cooperation competencies. *See* ROI at 358. After pointing out that an "Exceeds Expectations" in these capacities was lower than his prior year's "Outstanding" rating, despite having exceeded the prior year's performance, William Lewis (Black, African American) corrected Fitzig's 2016 Final Rating to reflect "Outstanding" ratings in all competencies. ROI at 361-362. Fitzig was praised for the variety of his assignments, his contributions to FSD, the Polygraph Program, and the Washington Field Office. ROI at 362. Fitzig was considered "highly productive" as an FSD/polygraph examiner and praised for the high quantity of polygraph examinations administered and the high percentage of conclusive examinations and admissions, which reflected the "quantitative and qualitative support of his

outstanding performance." ROI at 362. At no point in Fitzig's 2016 Final Rating was Fitzig criticized or instructed on ways in which he could improve or correct any performance or character deficiencies.

For Fitzig's 2017 Final Rating, he again received ratings of "Outstanding" in each of his goals, competencies, and overall rating. ROI at 359. Fitzig's willingness to volunteer for collateral duties such as quality control and mentoring was highlighted, as was the fact that he continued to lead the Polygraph Program in numbers of polygraph exams conducted and protection assignments volunteered. ROI at 359. Again, Fitzig was complimented for being able to elicit conclusive results and relevant information at consistently high percentages across large volumes of polygraph examinations and praised for the variety of assignments he undertook, concluding with Leary's express expectation that Fitzig would assume additional leadership responsibilities within the Polygraph Program in the future. ROI at 360.

For Fitzig's 2018 Final Rating, covering July 1, 2017 to June 30, 2018, he received an overall rating of "Exceeded Expectations," with both of his goals rated "Outstanding," one of his competencies—Teamwork and Cooperation—ranked as "Exceeds Expectations," and three of his competencies—Communication, Representing the Agency, and Technical Proficiency—ranked "Acceptable." Def.'s Ex 23, at Govt-252. Fitzig opposed these assessments, which differed markedly from his prior eight years' ratings, and highlighted his skills and accomplishments. Def.'s Ex 23, at Govt-252-254. Of note, Fitzig's 2018 rating period was the first since 2014 for which Lewis (Black, African American) was not the reviewing official, as Ciatti had taken over that role. Def.'s Ex 23, at Govt-255. The rating official, Bradley Beeler (white, Caucasian) criticized Fitzig for receiving technical guidance on three occasions from Polygraph Program supervisors, for once allegedly using inappropriate language during a polygraph exam, for

allegedly using an unauthorized test format to mitigate perceived countermeasures, and for allegedly inappropriately conducting lengthy post-test interviews of applicants who were evaluated as having passed polygraph examinations. Def.'s Ex 23, at Govt-254-255. None of these allegations, even if substantiated, are dated, and if they did occur, they did not occur until after the selections in question had already been made. Ex. 1, Pl.'s Responses to Def.'s Statement of Material Facts ¶¶ 56-58.

**Merit Promotion Process**

Amidst the *Reginald Moore v. DHS* class-action race discrimination lawsuit, the Secret Service revised its long-standing promotion process. The new process now includes assessments that specifically target important competencies from the competency model and consists of five steps: (1) Eligibility Determination; (2) Application Process; (3) First Level Evaluation; (4) Second Level Evaluation; and (5) Bidding Process. Ex. 7, SA MPP GS-14 Preparation Manual, p. 1.

"The U.S. Secret Service Special Agent Merit Promotion Process (SA MPP) was developed as a fair and objective means of selecting Special Agents for promotion to the GS-14 and GS-15 grade levels." Ex. 7, SA MPP GS-14 Preparation Manual, p. 1. The MPP utilizes a competency model, which identifies important competencies required for effective performance at the respective grade levels and defines differences in important competencies across these grade levels. The model was structured to mirror the OPM's Executive Core Qualifications (ECQs), used for SES employees throughout the federal government. This format allows for transparency in the progression from supervisory to executive ranks. The model includes five categories of competencies: Leading Change, Leading people, Results Driven, Business Acumen, and Building Coalitions. Each of these categories encompasses two to four individual competencies, which are

further defined by specific work behaviors. Ex. 7, SA MPP GS-14 Preparation Manual, p. 1.

Candidates are given MPP scores and thereby ranked relative to the rest of the candidates in consideration. When competing for a particular vacancy announcement, the higher the Candidate's MPP score, the higher their placement on the Best Qualified List ("BQL") for that announcement so long as they make the established cut-off score. At the time of the selections in question, Best Qualified Lists were ranked, indicating that relative MPP score differentials were informative and important to consider beyond merely establishing a threshold for consideration. *See, e.g.*, ROI at 301-308; 315-324; 331-334.

The MPP is based on competencies, which are essential skill or knowledge regarded as necessary to successfully perform the duties of a job." At the time of the selections at issue, there were a total of fifteen competencies the MPP measures and on which a candidate's score is based: Creativity and Innovation; Flexibility; Resilience; Leveraging Diversity; Team Building; Accountability; Decisiveness; Problem Solving; Technical Credibility; Human Resources Management; Influencing/Negotiating; Interpersonal Skills; Oral Communication; Partnering; Written Communication. Ex. 7, SA MPP GS-14 Preparation Manual, pp. 5-7.

Instead of evaluating candidates under these established criteria, Ciatti, Leary, Loveridge, Buster, and Jenkins each infused their own unvalidated personal and subjective evaluations of leadership capability, admitting that they placed greater weight on supervisor recommendations than the MPP scores of candidates. *See, e.g.*, Loveridge Dep. 169:20-170:3, 172:2-16. Loveridge affirmed that it is "absolutely true" that one needs a "push/pull" to get promoted, stating that the "push/pull" as "very important" to achieve promotion. Loveridge Dep. 169:20-170:4. Loveridge further stated that "[i]ndividuals seeking promotion need to have a good reputation in that their reputation will push them forward, and they need management officials who will 'pull' for them,

i.e. recommend them." ROI at 184. Of note, nowhere in the MPP is it stated that "breadth of experience" or "variety of assignments" is any of the 15 evaluated competencies, nor is the practice of "push/pull" recommendations from supervisors included as part of the MPP selection process. Although Loveridge stated that selections for promotions to all GS-14 special agent positions in Polygraph are made through the MPP, it is clear that the indispensable "push/pull" allowed for favoritism and bias to cloud a process designed to reward merit. ROI at 177.

In practice, the Agency picks and chooses when they consider the MPP score/rank and when they ignore it. Ex. 5, Fitzig Decl. ¶ 17. When a white candidate had a higher score than a Black candidate, then the Agency placed greater emphasis on the MPP score and BQL ranking. *See* Ex. 10, O'Connor Decl. ¶¶ 11, 23, 29. Fitzig's MPP score and BQL rank were superior to every one of the white selectees. Ex. 5, Fitzig Decl. ¶¶ 14; Ex. 11, Def.'s Resp. to Pl.'s Second Req. for Discovery, RFA 6. But because Fitzig is Black, mulatto, and has prior protected activity, the Agency was quick to ignore the relevancy of the scores/rankings and placed greater weight on subjective factors, which were pretext for their discrimination. Ex. 5, Fitzig Decl. ¶ 17.

## IV.   STANDARD OF REVIEW

In accordance with Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Further, summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986). In deciding a motion for summary judgment, the Court must believe the non-moving party's evidence and draw all justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255 (1986). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party moving for summary judgment bears the burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. See Fed. R. Civ. P. 56I(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Thompson v. McDonald*, 169 F. Supp. 3d 170, 179 (D.D.C. 2016). An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Id.* at 322-23. A fact is "material" if it has the potential to affect the outcome of the case. *Anderson*, 477 U.S. at 248 . The demonstration of a genuine issue of material fact is not a high bar; the issue of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Instead, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968). "[I]f reasonable minds could differ as to the import of evidence . . . a verdict should not be directed." *Anderson*, 477 U.S. at 250–51. In response, the non-movant must point to specific facts in the record that reveal genuine issues for which a trial is suitable. *Id.* Summary judgment is improper if disputes exist over material facts that "could affect the outcome of the suit under the governing law." *Id.* at 248.

A.   Burden Shifting Framework

Title VII of the Civil Rights Act of 1964 prohibits federal agencies, including the Defendant here, from discriminating in employment based on race. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (*citing* 42 U.S.C. § 2000e-16 (2000)). In the absence of direct evidence

of discrimination, the allocation of burdens and order of presentation of proof in a disparate treatment case is a three-step process. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973). Initially, a party alleging discrimination must establish a prima facie case by presenting facts that reasonably give rise to an inference of discrimination. *Id.* at 802. Under *McDonnell Douglas*, a plaintiff may establish a prima facie claim of discrimination by demonstrating that 1) he is a member of a protected class; 2) he suffered an adverse employment action; and 3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Second, the Agency must articulate legitimate, nondiscriminatory reasons for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Third, once the Agency successfully articulates a legitimate, nondiscriminatory reason, the burden shifts back to the party alleging discrimination to prove by preponderant evidence that the legitimate reason(s) proffered by the Agency are a pretext for discrimination. *Id.* at 256.

B.    <u>Legal Standard for Non-Selection Claims</u>

As discussed above, in the absence of direct evidence of discrimination, non-selection claims follow the well-established burden-shifting framework laid out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). In the context of non-selection claims, to prove a prima facie case a party must show that "(1) [he] is a member of a protected class; (2) [he] applied for and was qualified for an available position; (3) despite [his] qualifications, [he] was rejected; and (4) . . . someone filled the position . . . ." *Holcomb*, 433 F.3d at 895 (*citing Latham v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

Assuming the Defendant puts forth a legitimate, non-discriminatory rationale for its decision, the employee survives summary judgment by creating an inference that the "asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against [him] on a prohibited basis." *Stoe v. Barr*, 960 F.3d 627, 640 (D.C. Cir.

2020) (*quoting Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012)). In order to show pretext, a party "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for discriminatory reasons." *Id.* at 896-97. All evidence includes any combination of the evidence supporting Fitzig's prima facie case, evidence provided attacking the employer's alleged rationale for the decision, or any additional evidence of discriminatory intent. *Holcomb*, 433 F.3d at 895 (*citing Aka v. Wash Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*)). Courts "do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," because a fact finder may not believe the employer's stated reason, which would support a finding of intentional discrimination. *Stoe*, 960 F.3d at 640 (*quoting Aka*, 156 F.3d at 1290).

Whether there is sufficient evidence to demonstrate pretext is a fact-sensitive inquiry. A party can draw on any number of considerations to support a finding of pretext, including: (1) "preferential treatment of similarly situated employees outside the plaintiff's protected group," (2) "inconsistent or dishonest explanations," (3) "deviation from established procedures or criteria," (4) "pattern of poor treatment of other employees in the same protected group as the plaintiff," (5) "[t]he temporal proximity between an employee's protected activity and the employer's adverse action," and (6) "other relevant evidence that a jury could consider to reasonably conclude the employer acted with an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015); *see also Stoe*, 960 F.3d at 640. In non-selection cases, a Fitzig can also demonstrate pretext by showing that his qualifications made him "significantly better qualified" than the selectee(s) and by calling into question the employer's misstatements regarding Fitzig's qualifications. *Holcomb*, 336 F.3d at 897; *Stoe*, 960 F.3d at 644-45 (finding that a reasonable jury could find that a rigged or unfair review process was pretext for discrimination).

13

## V.     ARGUMENT

A.     <u>Fitzig has established a Prima Facie Case of Discrimination.</u>

Fitzig has established a prima facie case of discriminatory non-selection for each of the vacancies in question. It is undisputed that Fitzig is Black, of mulatto coloring, and has prior protected EEO activity. Def.'s SOF, ¶¶ 14-16, 20, 24-29. It is undisputed that Fitzig applied for and was qualified for each of the vacancies in question. Def.'s SOF ¶¶ 126, 337. It is undisputed that despite Fitzig's qualifications and scores, he was not selected for any of the vacancies in question. Def.'s SOF ¶¶ 139, 206, 245, 301, 336. It is undisputed that in each case, one or more Caucasian individuals of white coloring was selected to fill the vacancy. ROI at 293, 307, 323, 334, 344. It is undisputed that in each case, one or more individuals with no prior protected activity was selected to fill the vacancy. ROI at 293, 307, 323, 334, 344. Because Fitzig has stated a prima facie claim as to each of the positions in question, the burden shifts to Defendant to establish a legitimate, non-discriminatory reason for its selections for each of these vacancies. *Burdine*, 450 U.S. at 253.

B.     <u>Defendant's Purported Legitimate, Non-Discriminatory Reasons for Selections</u>

*i. FSD Vacancies*

In stating his overall justifications for not recommending Fitzig for any of the three FSD vacancies, Leary stated that he thought that the candidates that he recommended were "the best qualified" candidates for the promotions. ROI at 199. Leary stated that he did not think that Fitzig was "ready for promotion to the next level." ROI at 199. Leary stated that he had reservations about Fitzig serving as a potential manager and leader due to a situation in which he was allegedly removed as a Quality Control examiner and another situation in which he allegedly called a field examiner pretending to be someone else. ROI at 199-200. Leary claimed that these allegations

demonstrated questionable judgment and poor decision-making skills on the part of Fitzig and therefore he could not recommend him. ROI at 200. Ciatti recommended Hughes, Kistler, Ripperger, Hall, and Falgout based on career competencies, including communication, teamwork and cooperation, representation of the agency, technical proficiency, work ethic, decision-making, professionalism, leadership/potential for leadership, and peer respect. ROI at 208.

Ciatti stated that he based his belief that Fitzig was not the best qualified for these positions on events that raised "concerns regarding his professionalism, judgment, and communication skills," including an incident in July 2016 in which Fitzig allegedly hung up on Ciatti and Leary and on one occasion when he sent a "lengthy email" to Ciatti, copying Ciatti's supervisors and grossly misrepresented prior communications between Ciatti and Fitzig. ROI at 208.

### 1. Vacancy No. 17116

For positions in Vacancy 17116 Loveridge stated that he held a meeting with Leary and Ciatti. ROI at 177. Loveridge did not take any notes or retain any documentation from this process. ROI at 177-178. Loveridge relied extremely heavily on the recommendations from Leary and Ciatti, who he took to be the supervisors that work with all examiners on a daily basis. ROI at 178; Loveridge Dep. 81:6-7, 92:3-10. Loveridge did not rely on the input of Lewis or Alston. Loveridge Dep. 117:22-120:19. Leary and Ciatti recommended Tracey Hughes and Timothy Kistler for this vacancy, and Loveridge forwarded Leary and Ciatti's selections to DAD Breslin. ROI at 178.

In justifying his selection of Hughes, Loveridge noted that she had been assigned to FSD for over six years at the time of the vacancy announcement. ROI at 178. He stated that her "reputation for being a very serious hard worker" with "proven results" was "well known," and highlighted that she had been assigned to two major field offices. ROI at 178. Loveridge also noted that Leary had stated that Hughes was "well respected by other examiners." ROI at 178. Loveridge

also noted that Hughes had been an 1811 SA for approximately 18 years and had completed Phases 1 and 2 assignments. ROI at 178. Finally, Loveridge noted that based on personal experience with Hughes, she was "extremely professional" and had "great attention to detail." ROI at 178. Leary could not remember who he recommended for this position, but nevertheless insisted that his recommendation "would have been based on who [he] felt was best qualified for the position based on experience, abilities, and prior work experience." ROI at 202.

In justifying his selection of Kistler, Loveridge noted that he had been assigned to FSD for over a year at the time of the vacancy announcement. ROI at 178. Loveridge noted that Kistler's reputation in the U.S. Secret Service for being "an outstanding investigator" and "a rock solid protective agent" was rewarded by being assigned as an instructor for the Rowley Training Center (RTC), and selected to serve on the Presidential Protective Division. ROI at 178. Loveridge also noted that Kistler had been an 1811 SA for approximately 18 years and had completed Phases 1 and 2 assignments. ROI at 178. Loveridge also noted that according to his supervisor Leary, Kistler had "proven leadership skills" in his relatively short time in FSD, "commanding respect among his peers." ROI at 178. Finally, Loveridge noted that his personal experience with Kistler showed that he had an "excellent demeanor" and "a great amount of professionalism." ROI at 178. Leary could not remember who he recommended for this position, but nevertheless insisted that his recommendation "would have been based on who [he] felt was best qualified for the position based on experience, abilities, and prior work experience." ROI at 202.

Loveridge stated that Fitzig was not recommended by Leary and Ciatti. ROI at 178. When Leary was asked why he did not recommend Fitzig, his response was "I did not recommend [Fitzig]. I recommended other individuals for this position. I did not recommend [Fitzig] as I thought that other individuals were better qualified for this promotion based on my experience

during the previous two years in the Polygraph Program." ROI at 198. Ciatti recommended "two other candidates because [he] believed they were better qualified for the position" than Fitzig. ROI at 206.

### 2. Vacancy No. 17157

For the position in Vacancy 17157, Loveridge stated that he held a meeting with Leary and Ciatti. ROI at 180. Loveridge did not take any notes or retain any documentation from this process. ROI at 180. Loveridge relied extremely heavily on the recommendations from Leary and Ciatti, who he took to be the supervisors that work with all examiners on a daily basis. ROI at 180; Loveridge Dep. 81:6-7, 92:3-10. Loveridge did not rely on the input of Lewis or Alston. Loveridge Dep. 117:22-120:19. Leary and Ciatti recommended Ellen Ripperger for this vacancy, and Loveridge forwarded Leary and Ciatti's selection to DAD Breslin. ROI at 180.

Loveridge justified this recommendation by stating that Ripperger was "a top level examiner" and "respected by her peers," that she "coordinated all polygraph operations during the recent United Nations General Assembly when unprecedented applicant polygraph examinations were necessary to meet this agency's aggressive hiring initiative," and "has been coordinating several projects to include the build out of the Washington Field Office to increase the number of polygraph suites to accommodate our agency's need for a surge capacity of polygraph exams in the Washington DC area." ROI at 180. Leary stated that Ripperger had served as a Quality Control examiner, while Fitzig had been removed by program management at the same position. ROI at 202. Leary also stated that Ripperger had demonstrated a "high level of expertise while coordinating operational polygraph logistics and scheduling" during her service in the Polygraph Branch headquarters. ROI at 202.

When asked to compare Fitzig to the selectee in terms of each factor used, Loveridge merely stated "SA Louis Fitzig was not recommended by his immediate supervisors to fill this position." ROI at 180. When Leary was asked why he did not recommend Fitzig for this position, he stated "I recommended another individual based on my understanding of the position requirements and performance of the other individual." ROI at 198. Ciatti recommended Ripperger because she was the "best qualified for this position." ROI at 206.

### 3.   Vacancy No. 17165

For the positions in Vacancy 17165, Loveridge stated that he held a meeting with Leary and Ciatti. ROI at 182. Loveridge did not take any notes or retain any documentation from this process. ROI at 182. Loveridge relied extremely heavily on the recommendations from Leary and Ciatti, who he took to be the supervisors that work with all examiners on a daily basis. ROI at 182; Loveridge Dep. 81:6-7, 92:3-10. Loveridge did not rely on the input of Lewis or Alston. Loveridge Dep. 117:22-120:19. Leary and Ciatti recommended Nicholas Hall and Lonnie Falgout for this vacancy, and Loveridge forwarded Leary and Ciatti's selections to DAD Breslin. ROI at 182.

Loveridge justified his recommendation of Hall by stating that Hall had been assigned to FSD for approximately 11 months and had previously worked as a polygraph examiner at FSD for approximately four years. ROI at 182. Hall was a "Whip" on the Presidential Protective Division and had "excelled in his role as an examiner assigned to FSD." ROI at 182. Loveridge noted that Hall had been an 1811 SA for approximately 15 years and had completed Phase I and II assignments. Loveridge also noted that according to his supervisors, Hall was "well respected by the other examiners." ROI at 182. Leary stated that Hall was on his second tour as a polygraph examiner after completing his Phase II assignment and that he had been a successful quality control examiner at headquarters and as a mentor to new examiners. ROI at 203.

Loveridge justified his recommendation of Falgout by noting that he had received the Frank Sackler award for exemplary performance and dedication in support of the USSS Polygraph Program. ROI at 182. He also stated that Falgout had been an 1811 SA for approximately 17 years and had completed Phase I and Phase II assignments. ROI at 182. Finally, Loveridge stated that according to Falgout's supervisors, he had "proven leadership skills" and was "called upon by his supervisors to conduct high profile polygraph examinations." ROI at 182. Leary stated that Falgout was also on his second tour as a polygraph examiner and had been one of the most successful criminal polygraph examiners in the USSS Polygraph Program, and had served as a mentor. ROI at 203.

When asked to compare Fitzig to the selectee in terms of each factor used, Loveridge merely stated "SA Louis Fitzig was not recommended by his immediate supervisors to fill this position." ROI at 182. When asked why he did not recommend Fitzig for either position available under this vacancy, Leary stated "I did not recommend [Fitzig]. I recommended the individuals for the position who I thought were the best qualified based on my experience and knowledge of the Polygraph Program." ROI at 199. Ciatti recommended Hall and Falgout because he believed that they were the "best qualified" for the position. ROI at 207.

ii.      *Vacancy 17195*

Robert Buster was the selecting official for this vacancy. ROI at 212. Buster alleged that this position was filled according to the MPP. ROI at 212. Buster asked his Deputy Assistant Director to seek input from the SAIC of the Special Operations Division in making his selection. ROI at 212. In making his selection, Buster considered the "length of time the candidate had been employed with the Agency," "their assignment histories," "experiences working with internal and/or external partners" and "experiences leading groups of individuals and/or serving in

leadership roles." ROI at 213. Buster did not give weight to the MPP scores of the candidates. ROI at 213.

In justifying his selection of Timothy Desmond, Buster noted that Desmond had been in the Secret Service for approximately 17 years and had a "good range of experience" in both the protective and investigative context. ROI at 213. Buster also noted that Desmond held leadership roles, such as the Whip of the counter-surveillance unit, serving as the ATSAIC of the counter-surveillance unit, and serving as Whip of the Vice President-elect transition operations. ROI at 213. Buster also cited Desmond's oversight of the initial development and execution of Airspace Security planning for Presidential travel. ROI at 213.

In justifying his selection of Linda Canfield, Buster noted that she had been with the Agency for 15 years, having served in both large and small field office assignments. ROI at 214. Buster noted that Canfield had worked on the PPD and that her work at the WFO was "outstanding." ROI at 214. Buster also noted that Canfield served as a Backup. ROI at 214.

In justifying his decision not to select Fitzig, Buster stated that Fitzig had been in NYC for four years, on the PPD for four years, and on SOD for less than a year, having been on FSD for almost ten years, and so he did not have the same diversity of assignments as a special agent as did the selectees. ROI at 214. Buster also stated that he was not recommended by anyone for this position. ROI at 214.

     *iii.*     *Vacancy 17209*

Kenneth Jenkins was the selecting official for this position. ROI at 171. Jenkins primarily considered a candidate's assignment history spreadsheet and "consider[ed] and weigh[ed] a number of factors, including the candidate's assignment history." ROI at 172. Jenkins selected Michael Fagan for this position because he had approximately 20 years of experience at the

USSS at the time of his selection, had completed Phase I and II assignments, and was serving in

a post-protection Phase III assignment. ROI at 172. Fagan also had protection experience and his

supervisors "strongly recommended" and "spoke highly of him." ROI at 172.

    C.    <u>A Reasonable Jury Could Conclude that Defendant's Proffered Justifications for Failing to Recommend and Select Fitzig for the Positions in Question are Pretext for Discrimination and Retaliation.</u>

        *i.* *Defendant's justifications of its reasons for recommending and selecting candidates are vague and therefore suggestive of pretext.*

"[C]ourts traditionally treat explanations that rely heavily on subjective considerations with

caution." *Aka*, 156 F.3d at 1298.  In *Aka*, the *en banc* D.C. Circuit reversed the district court's

grant of summary judgment because a reasonable jury could find the decisionmaker's claim that

the Mr. Aka displayed no enthusiasm for the job during his interview to be a pretext for

discrimination. *Id.* Similarly, summary judgment should be denied here because a jury could reject

the manifold claims that recommending officials offer for why they neither selected nor

recommended Fitzig.

Loveridge's claim that he declined to recommend Fitzig for promotion because of Leary's

vague statement that Fitzig did not have "leadership skills," Def.'s SOF ¶ 109, and vague,

unsubstantiated allegations that candidates like Kistler and Falgout had "proven leadership skills,"

ROI at 178, 182, are purely subjective in nature and the proper domain of the jury. Defendant relies

almost exclusively on such subjective claims in justifying their selections: Hughes's "reputation

for being a very serious hard worker" with "proven results" was "well known," and she was "well

respected by other examiners," "extremely professional" and had "great attention to detail." ROI

at 178; Kistler was "an outstanding investigator" and "a rock solid protective agent" with "proven

leadership skills," with an "excellent demeanor" and "a great amount of professionalism." ROI at

178; Ripperger was "a top level examiner" and  "respected by her peers," ROI at 180;  Hall was

"well respected by the other examiners" ROI at 182; Falgout had "proven leadership skills" ROI at 182; Desmond had a "good range of experience" in both the protective and investigative context, ROI at 213; Canfield's work at the WFO was "outstanding," ROI at 214; and Fagan's supervisors "strongly recommended" and "spoke highly of him." ROI at 172. But such justifications are insufficient unless the Defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. *Woodruff v. Dimario*, 164 F. Supp. 2d 1, 6 (D.D.C. 2001), aff'd, No. 01-5321, 2002 WL 449776 (D.C. Cir. Feb. 21, 2002) (citing *Burdine*, 450 U.S. at 258).

In *Figueroa v. Pompeo*, the D.C. Circuit made clear that when a Defendant proffers subjective reasons for a selection, "the evidence must provide fair notice as to how the employer applied the standards to the employee's own circumstances. Failing to provide such detail—that is, offering a vague reason—is the equivalent of offering no reason at all." 923 F.3d 1078, 1092 (D.C. Cir. 2019).  Other circuits have held that the use of subjective criteria alone may give rise to an inference of pretext. *See Turner v. Public Service Co. of Colorado,* 563 F.3d 1136, 1136, 1145 (10th Cir. 2009) (holding that court should "'infer pretext . . . when the criteria on which the employers ultimately rely are *entirely subjective* in nature'" (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (emphasis added))); *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) (holding at the prima facie case stage an employer "may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process . . . is challenged as discriminatory") (quoting *Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980)); *Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 457 (7th Cir. 1991) (discussing "the ease with which employers may use subjective factors to camouflage discrimination"); *Bell v. Bolger*, 708 F.2d 1312, 1319–20 (8th

Cir. 1983) ("[S]ubjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse.").

ii. *Fitzig's qualifications for the positions in question are plainly superior to those of the individuals recommended and subsequently selected.*

### 1. Vacancy 17116

#### a    Tracey Hughes

In justifying the Agency's decision to recommend Hughes for this position, relevant officials stated that she had been at FSD for over six years and had been an 1811 SA for approximately 18 years, having completed her Phase I and Phase II assignments. ROI at 178. At the time of the selections for this vacancy, Fitzig had been at FSD for close to nine years, had been an 1811 SA for over 19 years, and had also completed his Phase I and Phase II assignments, and was serving in his Phase III assignment at the time. ROI at 119, 129, 303. While the relevant officials also made claims about Hughes's reputation, these claims are subjective and unsubstantiated, and Fitzig's "excellent reputation within FSD" is an even stronger endorsement of the esteem in which Fitzig was held by his peers. Ex. 4, Lewis Decl. ¶ 7; Ex. 3, Alston Decl. ¶ 12. Hughes is lauded for working on the PPD and in two major field offices, but the same can be said of Fitzig, who has worked in the NYFO, the WFO, and on the PPD. ROI at 129.

Furthermore, unlike Fitzig, Hughes was not a designated Senior Special Agent. Ex. 5, Fitzig Decl. ¶ 10. Although Hughes was eligible to be a mentor, she was not designated a mentor at the time of her selection. Ex. 5, Fitzig Decl. ¶ 9. Hughes had no known strengths in operations related tasks nor any known leadership experience during Phase I, II, or III of her career at the time of their selections. Ex. 5, Fitzig Decl. ¶ 9. Finally, Fitzig ranked 54 slots ahead of selectee Tracey Hughes on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile of

candidates, while Hughes's MPP score placed her at the top 18.44 percentile. Ex. 8, Final Scores and Rankings for 2016 - 2017.

b.   <u>Tim Kistler</u>

In justifying the Agency's decision to recommend Kistler for this position, relevant officials stated that he had been at FSD for over one year, and had been an 1811 SA for approximately 18 years. ROI at 178. At the time of the selections for this vacancy, Fitzig had been at FSD for close to nine years, had been an 1811 SA for over 19 years. ROI at 119, 129, 303. While the relevant officials praised Kistler for having an "excellent demeanor" and "a great amount of professionalism," these claims are subjective and unsubstantiated, and Fitzig's "excellent reputation within FSD" is an even stronger endorsement of the esteem in which Fitzig was held by his peers. Ex. 4, Lewis Decl. ¶ 7; Ex. 3, Alston Decl. ¶ 12. Officials also cited Kistler's selection to PPD as being impressive, while Fitzig's own experience with PPD apparently did not register in his favor. ROI at 129. Finally, Loveridge noted Kistler's "proven leadership skills in his relatively short time in FSD" was cited to justify his selection, while Fitzig's extensive leadership experience—having served on the PPD, as Phase I Special Agent in the NYFO, as Group Leader in the Bank Fraud Squad, as a Phase II Special Agent in SOD, as a Whip in the Airspace Branch, as a Phase III Special Agent in FSD, and as the Backup for the Polygraph Unit at the WFO at the time of the selections in question—did not stack up to the year of experience Kistler was commended for amassing. ROI at 129. Finally, Kistler was called a "rock solid protective agent," even though it was Fitzig whom Leary had recently commended for leading the Polygraph Program in number of protection assignments volunteered. ROI at 178, 359.

Furthermore, Kistler was not considered a "senior field examiner," but was considered a junior examiner. ROI at 111-112. Kistler was not a mentor, and with less than one-hundred

24

polygraph exams conducted, Kistler was not even eligible to be a mentor at the time of his selection. ROI at 111-112; Ex. 3, Alston Decl. ¶ 8. Kistler had no known strengths in operations related tasks nor any known leadership experience during Phase I, II, or III of their careers at the time of their selections. Ex. 5, Fitzig Decl. ¶ 9. In Kistler's statement of qualifications for this position, he merely wrote "I have been a certified Polygraph Examiner since September 2015." ROI at 291. Finally, Fitzig ranked 286 slots ahead of selectee Tim Kistler on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile, while Kistler's MPP score placed him at the 50.13 percentile. Kistler's MPP score was so low, he made the cut-off score for only two out of 16 vacancies that had established cut-off scores. Ex. 8, Final Scores and Rankings for 2016 - 2017.

c.   Fitzig

In stating his qualifications for this position, Fitzig noted that he had served in the WFO since 2008 and had the highest volume of exams of any examiner. ROI at 288. Fitzig emphasized his leadership qualities, noting that as Backup Polygraph Examiner and one of the most senior examiners, he consistently led the program in number of exams conducted, conclusive results, and admissions obtained. ROI at 288. Moreover, Fitzig had a demonstrated track record of operations experience as a Whip in SOD/Airspace and was a designated Backup over the Polygraph Section at WFO. ROI at 129. Fitzig placed third out of 14 candidates for promotion on the BQL. There were only two other higher ranked candidates for promotion (Gipson #1; Preston #2 [selected for Vacancy No. 17102]), and neither of them were certified polygraph examiners at the time. The third individual (Walker) was not a candidate for promotion; he was already a supervisor ATSAIC-14 and was a candidate for reassignment and was not a currently certified polygraph examiner. ROI at 283-285.

## 2. Vacancy 17157

In justifying the Agency's decision to recommend Ripperger for this position, relevant officials stated that she was a "top level examiner respected by her peers." By the same token, Fitzig had recently been commended by Leary for "continu[ing] to lead the Polygraph Program in numbers of polygraph exams conducted and protection assignments volunteered." ROI at 352. Although reputation and respect are difficult to substantiate, multiple FSD supervisors have testified that Fitzig had an "excellent reputation" within FSD as a polygraph examiner based on his experience, performance, and above-average stats. Ex. 4, Lewis Decl. ¶ 7; Ex. 3, Alston Decl. ¶ 12. Loveridge specifically commends Ripperger for her work coordinating polygraph operations during the United Nations General Assembly, but this accomplishment only lasted three months and pales in comparison with Fitzig's leadership and operations role as Backup at the WFO, from 2013 to 2018, during which he coordinated polygraph exams and logistics for several ELAC mass-testing initiatives, work that Leary commended him for in Fitzig's 2017 Final Rating. ROI at 352, 359.

At the time of her promotion, Ripperger had only just been designated a Senior Special Agent and had no practical work experience in the role. ROI at 305. Ripperger was not considered a top-level examiner, nor was she respected by her peers. ROI at 150; Fitzig Dep. 115:1-116:24. Ripperger was not certified to be a mentor at the time she was selected for this vacancy. Ex. 5, Fitzig Decl. ¶ 11. Ripperger was brought over to HQ Polygraph Operations, absent a JOA, and received the unfair advantage of three months of operations experience prior to her promotion. Ex. 5, Fitzig Decl. ¶ 11. Nevertheless, Ripperger fails to include any operations experience in her two-sentence Statement of Qualifications for this vacancy. ROI at 292, 305, 321.

Ripperger had a poor reputation due to a number of emotional outbursts within the workplace and several applicant complaints, one of which led to a DHS-OIG investigation due to

allegations involving her misconduct. ROI at 120. Ripperger was the subject of a misconduct investigation following her failure to properly secure a weapon magazine at the airport which was seized by TSA. Ex. 5, Fitzig Decl. ¶ 19. Ripperger was the subject of numerous applicant complaints regarding her alleged misconduct, one of which gained media attention. Ex. 5, Fitzig Decl. ¶ 11. Finally, Fitzig ranked 475 slots ahead of selectee Ellen Ripperger on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile of candidates, while Riperger's MPP score placed her at the 75.95 percentile. Ex. 8, Final Scores and Rankings for 2016 - 2017. Fitzig placed second out of nine candidates for promotion on the BQL; there was only one other higher ranked candidate (Gipson #1), and he was not currently certified. ROI at 302.

Fitzig stated that his qualifications include his record of exemplary performance as a Phase III/SA Field Polygraph Examiner, currently certified. ROI at 303. Fitzig also noted his nine years of experience in the FSD polygraph program, and asserted his proven ability to lead by example, as exemplified by his role as the Backup to the WFO, the field office with the highest volume of applicant testing, and as a Whip in SOD and Airspace. ROI at 303; Ex. 5, Fitzig Decl. ¶ 5. Fitzig further adduced his mission orientation, role as a team player, keen attention to detail, and strong work ethic, as exemplified in the highest number of exams conducted, conclusive results yielded, admissions obtained, and protective assignments volunteered. ROI at 303. Fitzig also averred his high level of integrity, professionalism, and ethical conduct, as evidenced by the fact that he had never been the subject of a substantiated applicant complaint or lawsuit. ROI at 303. Further, Fitzig noted he regularly assisted with the collateral duties of Quality Control, Mentorship, and Polygraph presentations to employees, in addition to assisting Polygraph Operations with logistics support for numerous ELAC testing initiatives at the Washington Field Office. ROI at 303. Finally, Fitzig noted that he held the unique distinction of having been the recipient of three FSD Century awards

and had been rated "Outstanding" for the prior six rating periods. ROI at 303.

### 3. Vacancy 17165

<u>a</u>      <u>Lonnie Falgout</u>

In justifying the Agency's decision to recommend Falgout for this position, relevant officials stated that he had received the Frank Sackler award for exemplary performance to and dedication in support of the Polygraph Program, and had been one of the most successful criminal polygraph examiners in the USSS Polygraph Program. ROI at 182, 203. These would seem to be at least as relevant as the program-leading polygraph statistics that Fitzig amassed, and the unprecedented three consecutive Century awards he accumulated prior to this selection. ROI at 303, 359. Falgout was also praised for the approximately 17 years of experience as an 1811 SA he had attained and his having completed his Phase I and II assignments, but Fitzig matched or exceeded, having completed both phases and boasting over 19 years of experience as an 1811 SA. ROI at 182, 129. Falgout's two years of polygraph experience at the time of selection pale in comparison with Fitzig's nine. ROI at 203, 129. Additionally, although management officials made vague claims of Falgout's "proven leadership skills," because none of the relevant officials mentions a single leadership position Falgout held in Phases I, II, or III, it is unclear how they stack up against Fitzig's extensive leadership experience—having served on the PPD, as Phase I Special Agent in the NYFO, as Group Leader in the Bank Fraud Squad, as a Phase II Special Agent in SOD, as a Whip in the Airspace Branch, as a Phase III Special Agent in FSD, and as the Backup for the Polygraph Unit at the WFO at the time of the selections in question. ROI at 129. While Falgout had no known strengths in operations experience and management does not adduce them in justifying recommending him for this position, as Backup at the WFO from 2013 to 2018, Fitzig coordinated polygraph exams and logistics for several ELAC mass-testing initiatives, operations work that Leary commended him for in Fitzig's 2017 Final Rating. ROI at 352-3, 359-60. Finally,

Fitzig ranked 536 slots ahead of selectee Lonnie Falgout on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile, while Falgout's MPP score placed him at the 84.28 percentile. Ex. 8, Final Scores and Rankings for 2016 - 2017.

b.    Nicholas Hall

In justifying the Agency's decision to recommend Hall for this position, relevant officials stated that Hall had been assigned to FSD for approximately 11 months and had four years of prior FSD experience, which combine to approximately half of Fitzig's more than nine years of experience at the time of selection. ROI at 182, 129. Hall's approximately 15 years of experience as an 1811 SA and having completed Phases I and II are also feats Fitzig matched or exceeded, having completed both phases and boasting over 19 years of experience as an 1811 SA. ROI at 182, 129. Like Hall, Fitzig had also served as a Whip and on the PPD. ROI at 182, 129. Loveridge and Leary noted that Hall had been a successful quality control examiner and a mentor to new examiners, both traits Leary had specifically commended Fitzig for in his 2017 Final Rating. ROI at 203; 359-360. While the management officials mention that Hall was "well respected by the other examiners" and make other subjective assessments, these are unsubstantiated and, in any event, are outmatched by testimony as to Fitzig's "excellent reputation" within FSD as a polygraph examiner based on his experience, performance, and above-average stats. Ex. 4, Lewis Decl. ¶ 7; Ex. 3, Alston Decl. ¶ 12. Finally, Fitzig ranked 273 slots ahead of selectee Hall on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile, while Hall's MPP score placed him at the 48.36 percentile. Ex. 8, Final Scores and Rankings for 2016 - 2017. Finally, Hall's operations experience was limited to one year as a Quality Control examiner at Polygraph operations. ROI at 319.

c.    Fitzig

Fitzig stated that his qualifications include his record of exemplary performance as a Phase III/SA Field Polygraph Examiner, currently certified. ROI at 303. Fitzig also noted his nine years of experience in the FSD polygraph program, and mentioned his proven ability to lead by example, as exemplified by his role as the Backup to the WFO, the field office with the highest volume of applicant testing. ROI at 303. Fitzig further explained his mission orientation, role as a team player, keen attention to detail, and strong work ethic as exemplified in the highest number of exams conducted, conclusive results yielded, admissions obtained, and protective assignments volunteered. ROI at 303. Fitzig also adduced his high level of integrity, professionalism, and ethical conduct, as evidenced by the fact that he had never been the subject of a substantiated applicant complaint or lawsuit. ROI at 303. Further, Fitzig noted he regularly assisted with the collateral duties of Quality Control, Mentorship, and Polygraph presentations to employees, in addition to assisting Polygraph Operations with logistics support for numerous ELAC testing initiatives at the Washington Field Office. ROI at 303. Finally, Fitzig noted that he held the unique distinction of having been the recipient of three FSD Century awards and had been rated "Outstanding" for the prior six rating periods. ROI at 303. Fitzig placed second out of 11 candidates for promotion on this BQL. There was only one other higher ranked candidate (Gipson #1), and he was not certified at the time. ROI at 302.

### 4.  Vacancy 17209

Fitzig placed eleventh out of 31 candidates for promotion on the BQL. None of the candidates who placed higher than Fitzig, with the exception of #2 and #7, had airspace experience. (Perry #1 [subject of prior disciplinary action]; Gipson #2; Regalla #3; Gracia #4; Finaldi #5 [selected for Vacancy No. 17198]; William Fowler #6 [selected for Vacancy No. 17200]; Patterson #7; Molina #8; Reisenweber #9 [subject of prior disciplinary action]; Gonzalez #10). Ex. 5, Fitzig Decl. ¶ 14.

### a.     Linda Canfield

Buster's justified selecting Canfield on her having served for over 15 years in large and small field offices. ROI at 214. Fitzig had served in the USSS for over 19 years by the time of this vacancy, and had worked in two large field offices, including headquarters. Compl. ¶¶ 17-18. Buster noted that Canfield had worked at PPD, as did Fitzig; that her work was "outstanding," as was Fitzig's as seen in his reviews leading up to this selection; and had served in a leadership position as a Backup, as had Fitzig for years at that point. ROI at 129; 214; 359-363.

Canfield's leadership experience was limited to being Backup at the Washington Field Office. There is no evidence that Canfield was a designated Senior Special Agent, as was Fitzig. Canfield had no airspace experience. Conversely, Fitzig had a demonstrated track record of operations experience as a Whip in SOD/Airspace and was a designated Backup over the Polygraph Section at WFO. Ex. 5, Fitzig Decl. ¶ 5. Finally, Fitzig ranked 143 slots ahead of selectee Linda Canfield on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile, while Canfield's MPP score placed her at the 30.60 percentile. Canfield placed 23 out of 31 candidates for promotion on the BQL. Ex. 8, Final Scores and Rankings for 2016 - 2017.

### b.     Timothy Desmond

Buster cites Desmond's 17 years of experience in the Secret Service, but at the time of this selection, Fitzig had more than 19 years of experience. ROI at 129, 213; Compl. ¶ 15. Buster also notes Desmond's "good range of experience" in both the protective and investigative contexts, ROI at 213, but it is unclear how this compares with the WFO-leading protective activity Leary complimented Fitzig for in his 2017 Final Rating. ROI at 359. While Buster asserts serving as Whip and ATSAIC of the counter-surveillance unit and Whip of the Vice President-elect transition operations as indicia of leadership, it is subjective to say that these outshine Fitzig's leadership

experiences as the Phase I Group Leader at the NYFO, Phase II Whip at SOD/Airspace, and the Backup for the WFO's Polygraph Unit for over four years by the time of this selection. ROI at 129. Desmond had limited airspace experience, whereas Fitzig had approximately two years of experience in the airspace program (on PPD and SOD) between 2006 and 2008, including serving in a leadership capacity as a Whip. Ex. 5, Fitzig Decl. ¶ 4.

Of note, in the rating period immediately preceding the vacancy in question, Desmond scored equal to Fitzig on his goals, equal to Fitzig on three competencies and lower than Fitzig as to Technical Proficiency. Ex. 12, T. Desmond 2016 Final Rating; ROI at 359. Finally, Fitzig ranked 157 slots ahead of selectee Timothy Desmond on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile, while Desmond's MPP score placed him at the 32.51 percentile. Desmond placed 26 out of 31 candidates for promotion on the BQL. Ex. 8, Final Scores and Rankings for 2016 - 2017.

### 5. Vacancy 17195

Jenkins justified picking Michael Fagan for this vacancy because he had approximately 20 years of experience at the USSS at the time of his selection and had completed Phase I and II assignments. ROI at 172. Fitzig had also completed approximately 20 years of experience at USSS, and his Phase I and Phase II assignments were arguably more impressive than Fagan's, given that Fitzig's Phase I assignment was in a large field office and he completed two Phase II assignments: PPD and SOD-Airspace, whereas Fagan completed his Phase I assignment in a small field office and his Phase II assignment was on Former President Clinton's PPD detail. ROI at 129. Jenkins also stated that Fagan's supervisors "strongly recommended" him and "spoke highly of him," though omits any detail from these subjective and unsubstantiated judgments; in any event, Fitzig's supervisors spoke at least as glowingly about his reputation and talents. Ex. 4, Lewis Decl. ¶ 7; Ex. 3, Alston Decl. ¶ 12.

Fitzig placed third out of 26 candidates for promotion on the BQL. Fagan placed fifteenth out of 26 candidates for promotion on the BQL. There were two other higher ranked candidates (Reisenweber #1 [subject of prior disciplinary action]; Beck #2 [subject of disciplinary action that led to demotion]). Ex. 5, Fitzig Decl. ¶ 14.

Fitzig ranked 297 slots ahead of selectee Fagan on the MPP ranking. Fitzig's MPP score placed him at the top 11.06 percentile, while Fagan's MPP score placed him at the 51.63 percentile. Ex. 8, Final Scores and Rankings for 2016 - 2017.

  *iii. Defendant's explanations for its selections are unworthy of belief.*

  **1. Non-selections for positions within the Office of Investigations, Forensic Services Division are incoherent.**

    a. <u>Loveridge's reliance on the recommendation of white supervisors over Black supervisors raises an inference of race discrimination.</u>

Throughout his deposition, Loveridge is clear that he relied heavily, if not exclusively, on the recommendations of Leary and Ciatti for making his own recommendations for who should be selected for Vacancies 17116, 17157, and 17165. Def.'s SOF ¶ 99. The primary reason Loveridge gives for relying on these two supervisors for their recommendations was that they had day-to-day oversight of the candidates, including Fitzig. Def.'s SOF ¶ 99. Yet, Loveridge's failure to seek input from Fitzig's two Black supervisors, Lewis and Alston, raises questions about the truth of his assertion that day-to-day oversight of Fitzig made Leary and Ciatti more influential.

Loveridge admitted that Lewis was Fitzig's second-line supervisor at the time he made his recommendation for at least one position, Vacancy 17116. Loveridge Dep. 117:22-118:6. Nevertheless, Loveridge supplied a number of reasons for not considering the input of Lewis, including that he was allegedly considered "incompetent" and "aloof" by polygraphers in FSD, Def.'s SOF ¶ 112, and that he was not a polygraph examiner, Def.'s SOF ¶ 113. Despite

highlighting Lewis's lack of technical skills to explain why he discounted his input, Loveridge testified that he did not put much if any stock into the particularities of the polygraph process, disclaiming the importance of examinations an agent has conducted, rate of inconclusive polygraphs, and rate of obtaining admissions in favor of candidates having good "communication, empathy," and good leadership. Loveridge Dep. 189:9-192:11. It is unclear why Loveridge deemed Lewis unable to provide insight into the subjective factors Loveridge claimed to value, such as managerial skill, communication, empathy, and good leadership. This conflict between the reasons for rejecting Lewis' input and the criteria upon which he relied to make the selection decision raises an inference of pretext. *See Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) ("changes and inconsistencies in the stated reasons for an adverse action" are probative of pretext).

Loveridge also adduced Lewis's planned transfer to a different position as a justification for not seeking his input as to the recommendations about the future of the Polygraph Program, Def.'s SOF ¶ 114. Yet a planned transfer out of the Polygraph Program does not nullify the experience and observation that Lewis had accumulated until the end of July 2017. The fact that Loveridge was not bound by the recommendations of any of his subordinates and yet chose not to pursue Lewis's input suggests that he either did not care what input Lewis might have or that he was actively avoiding it. Loveridge Dep. 206:10-208:22.

Loveridge's exclusion of Alston from his recommendation process is even more perplexing. Alston was Fitzig's first-line supervisor as of the recommendations for Vacancies 17157 and 17165, but Loveridge stated that Alston did not have managerial responsibility of the polygraph examiners and so would not have been able to assess candidates to make sure that the program had the right people for the position. Loveridge Dep. 119:17-120:19. Yet as to Loveridge's most important criterion for needing to rely so heavily on Ciatti and Leary in making

his recommendation—i.e., that day-to-day oversight made Ciatti and Leary the best people to provide input as to whom he should recommend, Loveridge Dep. 77:17-78:2, 80:1-11, 97:9-98:2, 114:3-11, 115:22-116:8, 186:10-20—Loveridge stated that he did not know where Alston was located and had "no idea" how much day-to-day interaction Fitzig had with Alston and did not know whether Fitzig worked significantly more with Alston than he did with Ciatti and Leary. Loveridge Dep. 121:10-14; 123:6-16.

Loveridge was free to choose whom to invite to the meetings he conducted to gather information in pursuit of his eventual recommendations. Loveridge Dep. 113:14-21. Even though Loveridge was free to disregard the input of any individual whom he consulted in obtaining information as to candidates or their recommendation as to whom he, in turn, should recommend, a reasonable jury could find that his decision to exclude the two Black supervisors in the Polygraph Program in gathering input suggests that Loveridge's decisions were motivated by the race of the candidates and the supervisors. Loveridge testified that it did not concern him that there were no non-white people attending the meetings he conducted to determine whom to recommend. Loveridge Dep. 132:22-133:7. But Lewis and in particular Alston were uniquely positioned to provide feedback and to speak to Fitzig's qualifications for the positions in question, including Fitzig's unmatched leadership experience. Ex. 3, Alston Decl. ¶¶ 12-14; Ex. 4, Lewis Decl. ¶ 15. Moreover, as the Polygraph Program Backup, Alston was not only the most experienced and senior examiner within the Polygraph Program, but he also had regular, daily interactions with all of the examiners in the program. Ex. 3, Alston Decl. ¶ 7. Given that these were the very qualities Loveridge claimed to value in Ciatti and Leary, a reasonable jury could find it suspect that Loveridge did not consult Alston and conclude that the real reason he did not do so was to avoid selecting the most qualified Black applicant, especially given that Alston and Lewis both declared

that Fitzig was the best qualified candidate for Vacancies 17116, 17157, and 17165. Ex. 3, Alston Decl. ¶ 16; Ex. 4, Lewis Decl. ¶ 15; *Baylor*, 459 F. Supp. at 54 (a plaintiff can demonstrate pretext based on, inter alia, inconsistencies in the stated reason for an adverse action or the employer's general treatment of minority employees).

Moreover, Loveridge "rubberstamped" the inputs of Ciatti and Leary, accepting their recommendations for all five of the selectees for the FSD vacancies. Although Loveridge claimed that Leary and Ciatti provided him a "thorough review of the candidates" for these vacancies, he did not explain a single factor that contributed to this analysis, or why he thought it was thorough, and could not recall any during his deposition. ROI at 177; Loveridge Dep. 109:2-10. Loveridge himself did not conduct a thorough investigation of the candidates and could not recall any criteria he provided Ciatti and Leary other than to provide names from the Best Qualified List who would fit the needs of the Secret Service. Loveridge Dep. 108:17-109:17. *See Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019) (when making a decision based on subjective criteria, "the evidence must provide fair notice as to how the employer applied the standards to the employee's own circumstances. Failing to provide such detail—that is, offering a vague reason—is the equivalent of offering no reason at all.").

### b.   Management officials' justifications may be rejected by a jury.

Despite claiming to rely heavily on Leary to inform his recommendations, the recommenders' philosophies and claimed approaches to recommending whom they thought to be the best candidate for a position diverge markedly. Loveridge disclaimed the importance of polygraph skills in making his recommendations for the FSD vacancies, stating that he considered neither a candidate's inconclusive rate nor the number of polygraph exams a candidate administered. Loveridge Dep. 230:6-17. This is true even though solid, quality polygraph skills

are objectively demonstrated by a low inconclusive rate and the number of exams administered – factors ignored by Loveridge. ROI at 354. Nor did Loveridge consider years of service as a polygrapher. Loveridge Dep. 229:21-230:5. Yet Leary claimed that his recommendations for Vacancy Nos. 17116, 17157, and 17165 upon which Loveridge so heavily relied were designed to highlight individuals with "solid, quality polygraph skills." Def.'s SOF ¶ 109.

Aside from polygraphy skills, the only other criterion Leary mentions demonstration of "leadership skills." Def.'s SOF ¶ 109. This criterion is vague and probative of pretext. *See Woodruff*, 164 F. Supp. 2d at 6 ("The defendant's explanation of its legitimate reasons must be "clear and reasonably specific" so that the plaintiff is "afforded a full and fair opportunity to demonstrate pretext."). In Fitzig's case, the suggestion that he lacked leadership skills is not only at odds with the record, it is incoherent: only months prior to making the recommendations in question, Leary stated that "SSA Fitzig will assume additional leadership responsibilities within the USSS Polygraph Program in the future." ROI at 353. The term "additional" implies that Fitzig had already been participating in leadership activity, a fact that even a cursory review of Fitzig's leadership experience would corroborate. ROI at 129. Further, Leary's statement that he expected Fitzig to take on leadership responsibilities going forward is inconsistent with his professed doubts about his ability to lead only a few months after making the comment.

Pretext can also be found in the degree to which Loveridge treats even identical experience by Falgout and Fitzig differently. In reference to Falgout, Loveridge extolled the virtues of being a Whip and stated that holding the position was something to be proud of. Loveridge Dep. 202:14-18. Yet, Fitzig's experience as a Whip did not factor into Loveridge's decision, and it did not even merit him consideration for Vacancy 17157. Compl. ¶ 18; Loveridge Dep. 174:5-10. While Falgout's Frank Segler award contributed to his recommendation from Leary and Ciatti, neither

Fitzig's strong showing as to quality and quantity of polygraphs administered nor his three consecutive Century awards apparently moved Leary, Ciatti, or Loveridge to recommend him. Loveridge Dep. 26:3-21; 202:7-12; ROI at 303. *Chatterjee v. Ross*, No. CV 16-2402 (RC), 2020 WL 6709757 *5 (D.D.C. Nov. 16, 2020) ("A plaintiff can demonstrate that the employer's stated reason was 'not the actual reason' by 'produc[ing] evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances'") (*quoting Brady v. Office of Sergeant at Arms*, 520 F.3d 494, 495 (D.C. Cir. 2008)).

Ciatti's justifications also demonstrate pretext. Ciatti claimed to have considered established professional career competencies (communication, teamwork and cooperation, representation of the agency, and technical proficiency) and other qualitative characteristics (work ethic, decision-making, professionalism, leadership/potential for leadership, and peer respect) as extremely useful to informing my professional judgement and making recommendations during personnel selection processes. Def.'s SOF ¶ 110. Yet these factors are virtually identical[1] to the factors that the MPP, the objective measure on which Fitzig outperformed every selectee for all five of the vacancies in question, Ex. 11, Def.'s Resp. to Pl.'s Second Req. for Discovery, RFA 6, and which the selecting and recommending officials denied taking into account. Ex. 7, SA MPP GS-14 Preparation Manual. Def.'s SOF ¶¶ 90, 311, 347-48. Ciatti's claim to value the traits measured by the MPP, but to have substituted his own subjective judgment for that of an objective process designed to capture merit is probative of pretext. *Baylor v. Powell*, 459 F. Supp. 3d 47, 54 (D.D.C. 2020), aff'd, 847 F. App'x 7 (D.C. Cir. 2021) (stating that an employee can "point to

---

[1] The MPP's "Written Communication" and "Oral Communication" are analogous to communication; the MPP's "Technical Credibility" is analogous to technical proficiency; the MPP's "Interpersonal Skills," whose first criterion is "Demonstrates fairness, professionalism, and tact when interacting with others," is analogous to professionalism; the MPP's "Decisiveness" is analogous to decision-making; the MPP's "Leading Change: Creativity and Innovation," "Leading Change: Flexibility," Leading Change: Resilience," "Leading People" Leveraging Diversity," and "Leading People: Team Building" are analogous to leadership/potential for leadership and peer respect. USSS SA MPP Study Guide p. 5-7.

changes and inconsistencies in the stated reasons for the adverse action" or "the employer's failure to follow established procedures or criteria" to demonstrate pretext in a non-selection matter) (quotations omitted).

Finally, as to Vacancy 17116, Ciatti fails to articulate the criteria he used to determine that Kistler was the best qualified candidate to be assigned the major collateral duty of coordinating and ensuring all polygraph examiner continuing education courses. ROI at 144-145. Ciatti also fails to articulate the criteria he used to determine that Hughes was the best qualified candidate to be assigned the major collateral duty of coordinating all operational and logistical aspects of the Polygraph Examiner Internship, nor does he acknowledge that Hughes was not a mentor. ROI at 144-145. "[O]ffering a vague reason . . . is the equivalent of offering no reason at all." *Menoken v. Weichert*, No. CV 16-0083 (ABJ), 2019 WL 4418757, at *8 (D.D.C. Sept. 16, 2019), *aff'd sub nom. Menoken v. Cabaniss*, No. 19-5319, 2020 WL 1487743 (D.C. Cir. Mar. 12, 2020) (*citing Figueroa*, 923 F.3d at 1092).

### 2. FSD management officials' purported ignorance of Fitzig's race and color.

Incredibly, Defendant attempts to claim that Leary and Ciatti, two individuals who worked closely with Fitzig for years, and Loveridge, who had known Fitzig for two decades, were not aware of his race or color. Def.'s SOF ¶¶ 289, 291-293. Suspiciously, the scant few Agency employees who will commit to any assessment of Fitzig's race or color are those who state, incorrectly, that Fitzig is Italian. Def.'s SOF ¶¶ 387-88.

But claimed ignorance of a protected characteristic is an affirmative defense only when a responsible official could not have been aware of the protected characteristic; absent such circumstances, "[m]ere denials on the part of decision makers will not necessarily establish that a defendant was unaware of the [employee's] race." *Copeland v. Delphi E & E*, No. 1:01cv01, 2002

U.S. Dist. LEXIS 11906, at *11 (W.D. Mi. 2002); *see also Williams v. Wells Fargo Fin. Acceptance*, 564 F. Supp. 2d 441, 447–48 (E.D. Pa. 2008) (denying summary judgment because, inter alia, the investigating official had access to employees' racial demographic information, and had seen several African American plaintiffs a single time on a newscast); *Abe K. v. U.S. Postal Service*, EEOC OFO No. 121 LRP 40515, at *4 (November 10, 2021) (reversing a grant of summary judgment in part on credibility issues, as deciding official said she was unaware of the employee's protected characteristics after having interviewed the complainant just once). Nor can a selecting official's ignorance of an employee's protected characteristics insulate an employer from liability where, as here, the selecting officials act as a "rubberstamp" for the biased recommenders' endorsement. *See Thomas v. Paulson*, 507 F. Supp. 2d 59, 72 fn. 16 (D.D.C. 2007) ("employers may be liable under Title VII in 'situation[s] in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate.'"); *see also Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 288–89 (4th Cir. 2004) (*citing Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000), for the proposition "that the person allegedly acting pursuant to a discriminatory animus need not be the 'formal decisionmaker' to impose liability upon an employer for an adverse employment action, so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action").

Loveridge's pointed refusal to acknowledge race, however, likely contributed to a tolerance of patterns at FSD wherein outstanding people of color were systematically passed over in favor of mediocre white people. Although Loveridge testified that his "role was to stop [discrimination and retaliation] from happening," Loveridge Dep. 17:3-17, it is not clear that he ever took any initiative to combat or probe for racism at FSD, if he noticed it at all. Loveridge Dep. 242:9-243:7.

As FSD SAIC, Loveridge did not review the complaint of a Black woman who did not feel she was treated properly, Loveridge Dep. 19:4-13, and never sought out the results of an investigation pertaining to racial issues involving individuals he oversaw. Loveridge Dep. 53:18-55:16.

Despite agreeing that the "push/pull" element was "very important" for getting promoted, Loveridge stated that he did not know whether a non-white applicant for promotion *had ever* had the benefit of someone at the top levels pulling for or recommending them during the nearly three years that he was SAIC of FSD. Loveridge Dep. at 169:20-170:3, 172:17-173:4. Loveridge admitted that he "never thought of" whether there were more white people than non-white people at FSD, even though white people made up 67.96% of workers as of November 2017, and "never looked into [the races of the people within the division]." Loveridge Dep. 43:22-44:7; 49:11-14; ROI at 235. Such a staunch commitment to overlooking race and racism would naturally have the consequence of ignoring disparate impact, a practice Loveridge appeared at one point to defend. Loveridge Dep. 50:17-22 ("I do not discriminate in the promotion process. I do not do that. So whatever disparate effect it may have on the division, I put the best people that I possibly can in the positions that they need to be in for the good of the Service.").

### 3.   A reasonable jury could reject Defendant's criticisms of Fitzig.

#### a.   Leary's criticisms are unworthy of credence.

Defendant contends that Leary did not recommend Fitzig because he had concerns about Fitzig's judgment, decision-making skills, readiness for a promotion, and potential as a manager and as a leader. Def.'s SOF ¶¶ 175-6, 224-5, 275. Yet Loveridge met with Leary and Ciatti to discuss candidates between August and September 2017, less than two months after Leary rated Fitzig as "Outstanding" as to each competency, goal, and as to his overall annual rating. ROI at 352-353 (2017 Final Rating, dated July 19, 2017). Furthermore, Leary stated that "[i]t is expected

that SSA Fitzig will assume additional leadership responsibilities within the USSS Polygraph Program in the future," which would not be appropriate for anyone demonstrating questionable judgment and poor decision-making skills. ROI at 353. Furthermore, the statement implies that Fitzig had already been assuming leadership responsibilities, and indicates not concern about Fitzig's leadership abilities, but an affirmative exhortation to pursue them. This is credible evidence that "the employer 'is making up or lying about the underlying facts.'" *Chatterjee*, 2020 WL 6709757 at *5 (*quoting Brady*, 520 F.3d at 495); *see also, Walker*, 798 F.3d at 1092 (D.C. Cir. 2015) (a plaintiff may support an inference of pretext based on "inconsistent or dishonest explanations"). Leary also alleges that Fitzig had been removed as a Quality Control Examiner and had called a field examiner on a Sunday morning pretending to be someone else, Def.'s SOF ¶¶ 176, 225, 275, but Fitzig was never informed of this alleged removal, nor do his reviews document this action, indicating Leary is investing it with outsized importance retrospectively as pretext. ROI at 140.

Of note, Fitzig's July 2017 Final Rating—the last rating before the recommendations in question—does not contain any hint of admonishment for questionable judgment or poor decision-making skills and does not suggest that these are areas that Fitzig needed to improve. ROI at 352-353. What changed was not a sudden development in Leary's appraisal of Fitzig, but the fact that between the date of the review and the dates that the recommendations were made, Fitzig made an official EEO complaint. ROI at 140.

      b.   Ciatti's criticisms are also unworthy of belief.

Ciatti's litany of concerns are likewise unworthy of credence. Ciatti asserted concerns about Fitzig's professionalism, communication skills, and judgment, supporting the last of these with anecdotes about Fitzig allegedly hanging up the phone on Ciatti and of sending a "lengthy"

email grossly misinterpreting prior communications. Def.'s SOF ¶¶ 177-9, 226-8, 276-8. Yet none of the events Ciatti relies upon is substantiated, much less documented, and Ciatti did not begin alleging any claims of performance issues until after Fitzig made his EEO complaint. ROI at 146. *Walker*, 798 F.3d at 1092 (D.C. Cir. 2015) (observing that "[t]he temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation"). Furthermore, the record in this matter shows that the "lengthy" email to which Ciatti attached such outsized importance is actually one page long. ROI at 358. Moreover, Ciatti had in the past been removed by Lewis as Fitzig's reviewer after storming out of a meeting the three had during which Fitzig asked him why he was holding Fitzig to a different standard than junior, white polygraphers. Ex. 4, Lewis Decl. ¶¶ 11-14; ROI at 357. Lastly, Ripperger had a reputation for emotional outbursts and inappropriate, injudicious behavior at the time she was recommended and selected. Ex. 5, Fitzig Decl. ¶ 11. The fact that Leary and Ciatti not only downplayed Ripperger's alleged behavioral issues but convinced Loveridge to put aside his misgivings about recommending her strongly indicate a double standard based on race, color, or protected activity. Loveridge Dep. 206:14-208:5. *Chatterjee*, 2020 WL 6709757 at *5 ("A plaintiff can demonstrate that the employer's stated reason was 'not the actual reason' by 'produc[ing] evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances'") (*quoting Brady*, 520 F.3d at 495).

## VI.    CONCLUSION

Fitzig has provided sufficient evidence to survive summary judgment, as there are issues of material fact that are most appropriately determined by a jury. Accordingly, and based on the foregoing, Fitzig respectfully requests that Defendant's Motion be denied in its entirety, and

additionally or alternatively, that the Court rule that Fitzig is entitled to pursue discovery pursuant to Fed. R. Civ. P. 56(d).

Dated: February 18, 2022    Respectfully submitted,

            /s/ Conor Ahern
            Conor Ahern, D.C. Bar #1686432
            Alan Lescht & Associates, P.C.
            1825 K Street, N.W, Suite 750
            Washington, D.C. 20006
            Tel (202) 463-6036
            Fax (202) 463-6067
            conor.ahern@leschtlaw.com

            *Attorney for Plaintiff*