**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

LOUIS FITZIG,

        *Plaintiff*,

    v.

ALEJANDRO MAYORKAS, Secretary of
the Department of Homeland Security,[1]

      *Defendant*.

Civil Action No. 18-2552 (RDM)

---

**<u>MEMORANDUM OPINION AND ORDER</u>**

In this Title VII case, Plaintiff Louis Fitzig, a longtime United States Secret Service agent, challenges the Secret Service's failure to promote him on five different occasions in 2017, alleging that he was not promoted because of his race, color, and prior protected activity. Dkt. 3 (Compl.). Defendant the Secretary of Homeland Security (hereinafter the "Secretary" or the "Secret Service") has moved for summary judgment. Dkt. 38. The Secretary contends that the Secret Service has offered legitimate, nondiscriminatory, and nonretaliatory reasons for promoting other candidates and that Fitzig has failed to demonstrate that these proffered reasons are pretextual. Dkt. 38-1. The Court concludes that a reasonable jury could disagree with the Secret Service as to some of Fitzig's claims but not as to others, so it will **GRANT** in part and **DENY** in part the Secretary's motion.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary of Homeland Security, Alejandro Mayorkas, "is automatically substituted as a party" with no effect on the plaintiff's "substantial rights." Fed. R. Civ. P. 25(d).

# I. BACKGROUND

For present purposes, the Court sets forth the undisputed evidence and, where the evidence is disputed, the Court describes the evidence "in the light most favorable to the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). It bears emphasis, however, that a party seeking to dispute certain evidence at summary judgment must do so clearly and must come forward with specific, controverting evidence. It is not enough merely to assert—much less imply—that evidence is disputed. Here, as required by Local Civil Rule 7(h)(1), the Secret Service has provided a statement of material facts as to which it contends there is no genuine dispute, Dkt. 38-2 (Def.'s SUMF), and Fitzig has responded, Dkt. 46-1 (Pl.'s Resp. Def.'s SUMF). But Fitzig neither admits nor clearly disputes many of these facts, instead offering ambiguous responses. Most notably, when an asserted fact is supported by a citation to a witness's testimony, Fitzig often responds that he admits that the witness said what he or she said. That response does not place the asserted fact in genuine dispute. To create a genuine dispute of material fact, the nonmoving party must clearly dispute the asserted fact and must identify specific, controverting evidence. Admitting that a witness, in fact, gave the testimony cited in support of an asserted material fact does not create a genuine dispute as to the asserted fact or as to the content of that testimony. *See* Fed. R. Civ. P. 56(e) (indicating that a court can "consider [a] fact undisputed for purposes" of a summary judgment motion where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact").

A.      **Factual Background**

1.      *Fitzig's Employment with the Secret Service*

Fitzig identifies as a mixed-race Black man of multiracial color.[2]  Dkt. 46-1 at 95 (Pl.'s SUMF ¶ 17).  He began his Secret Service career in 1998, and for his first four-plus years worked as a special agent in the New York field office.  *Id.* at 1–2 (Pl.'s Resp. Def.'s SUMF ¶¶ 2–3).  This was, in Secret Service parlance, Fitzig's "Phase I" assignment.  *Id.* at 1–2 (Pl.'s Resp. Def.'s SUMF ¶ 3).  During his New York tour, Fitzig served in a variety of roles and was appointed Group Leader of the Bank Fraud Squad and named the Field Office Lead Agent Assist for several presidential and vice-presidential visits.  Dkt. 50-1 at 2–4 (Def.'s Resp. Pl.'s SUMF ¶¶ 3–6).

After his New York stint, Fitzig spent over four years as a special agent in the Presidential Protection Division ("PPD") and a further eleven months in the Special Operations Division.  Dkt. 46-1 at 2 (Pl.'s Resp. Def.'s SUMF ¶ 4).  Collectively, these assignments constituted Fitzig's "Phase II" assignment.  *Id.*  While in the Special Operations Division, Fitzig served as both the Airspace Program Whip and the Acting Assistant to the Special Agent in charge.  Dkt. 50-1 at 4–5 (Def.'s Resp. Pl.'s SUMF ¶¶ 8–9).  Although the parties do not specifically define the "Whip" role, they note that the Whip "has a significant part" in a protection detail and "is responsible for those who protect the protectee when the Special Agent in Charge is not there."  Dkt. 46-1 at 84 (Pl.'s Resp. Def.'s SUMF ¶ 359).

Fitzig began his Phase III assignment in 2008 as a polygrapher in the Forensic Services Division ("FSD") of the Office of Investigations in the Washington, D.C. field office.  Dkt. 46-1

---

[2] As discussed *infra*, Fitzig's racial identity—or the relevant decisionmakers' perception of his racial identify—is a matter of dispute between the parties.

at 2 (Pl.'s Resp. Def.'s SUMF ¶¶ 5–6); Dkt. 3 at 4 (Compl. ¶ 17).  In this role, he was

responsible for all aspects of the polygraph examination process, including conducting

examinations, evaluating results, and writing reports.  Dkt. 46-1 at 2–3 (Pl.'s Resp. Def.'s SUMF

¶¶ 9–11).  In June 2017, he was also made a Senior Special Agent ("SSA"), a designation

reserved for agents on their Phase III assignments who have at least fifteen years of service and

who meet certain performance and competence thresholds.  Dkt. 50-1 at 1 (Def.'s Resp. Pl.'s

SUMF ¶ 1).  At all times relevant to this lawsuit, Fitzig was a GS-13 level employee seeking a

promotion to the GS-14 level, although he was eventually promoted to a GS-14 position in 2020.

Dkt. 46-1 at 2–3 (Pl.'s Resp. Def.'s SUMF ¶¶ 7, 13).

Fitzig received strong performance reviews for his work in FSD, at least in the years

leading up to the non-promotions in question here.  In the eight rating periods before he applied

to the first of the vacancies at issue he was rated "outstanding"—the highest rating available—

across all of the competencies on which he was assessed.  Dkt. 50-1 at 18–19 (Def.'s Resp. Pl.'s

SUMF ¶ 25).  The last of these reviews, provided in July 2017, also stated that "[i]t is expected

that SSA Fitzig will assume additional leadership responsibilities within the USSS Polygraph

Program in the future."  *Id.* at 21 (Def.'s Resp. Pl.'s SUMF ¶ 29).  In addition to receiving

favorable performance reviews, Fitzig was a repeated recipient of the Century Award, an

accolade given to polygraphers who perform over 100 polygraphs in a given year.  Dkt. 39-7 at 3

(Def.'s Ex. 1); Dkt. 39-8 at 10 (Def.'s Ex. 1).

Despite Fitzig's estimable performance, all was not well between him and his

supervisors.  On January 27, 2017, he contacted an equal employment opportunity ("EEO")

counselor concerning his non-selection for a promotion (not at issue in this case) for which he

had applied.  Dkt. 39-1 at 34 (Def.'s Ex. 1).  He participated in "pre-complaint counseling" on

this matter, although he never filed a formal complaint.  Dkt. 46-1 at 3–4 (Pl.'s Resp. Def.'s SUMF ¶ 14–15, 17, 19).  This process was conducted anonymously, meaning that the EEO counselor interviewed FSD supervisors about Fitzig's complaint on a no-names basis.  *Id.* at 4 (Pl.'s Resp. Def.'s SUMF ¶ 18).  Fitzig was also identified as a possible witness in a colleague's employment dispute, although he was never contacted or asked to provide testimony in the matter.  *Id.* at 5 (Pl.'s Resp. Def.'s SUMF ¶¶ 20–21).

   2. *FSD and the Promotion Process*

   Promotions in the Secret Service are governed by what is known as the Merit Promotion Plan and follow a three-step process.  *Id.* at 15–16 (Pl.'s Resp. Def.'s SUMF ¶¶ 59, 62).  The first step is assessment: candidates fill out a promotion application and, in the case of GS-14 promotions, take the GS-14 agent promotion exam (the "APEX").  *Id.* at 16 (Pl.'s Resp. Def.'s SUMF ¶¶ 63, 65).  Candidates who receive a qualifying APEX score then complete an "assessment of career experiences" and obtain an evaluation from a supervisor.  *Id.* at 16–17 (Pl.'s Resp. Def.'s SUMF ¶¶ 67–68).  The output of this process is a Merit Promotion Process ("MPP") score, a composite of the candidate's APEX score, career experience assessment, and evaluation.  *Id.* at 17 (Pl.'s Resp. Def.'s SUMF ¶ 70).  The MPP process is used for only candidates seeking a promotion; candidates seeking reassignment to a position at their current grade level are not required to obtain an MPP score before applying.  *Id.* at 18 (Pl.'s Resp. Def.'s SUMF ¶ 76).

   At the next stage of the process, candidates who have obtained an MPP score may use it to bid for open positions.  *Id.* at 18 (Pl.'s Resp. Def.'s SUMF ¶ 75).  The most competitive candidates who bid on a vacancy (usually the top quartile or top thirty candidates, whichever category is larger) are then referred for consideration to the Advisory Board, a group of senior

Secret Service officials. *Id.* at 18–19 (Pl.'s Resp. Def.'s SUMF ¶ 77–82). These candidates are ranked by MPP score on what is known as the "best-qualified list"—a higher MPP score corresponds to a higher position on the best-qualified list. Dkt. 38-2 at 11 (Def.'s SUMF n.2).

The last stage of the process is selection. Each GS-14 vacancy is assigned to a selecting official in the division in which the vacancy sits. Dkt. 46-1 at 19 (Pl.'s Resp. Def.'s SUMF ¶ 83). The selecting official presents his or her choice of candidate to the Advisory Board for consideration, and the Board can approve that candidate by a majority vote. *Id.* at 19 (Pl.'s Resp. Def.'s SUMF ¶ 83).

During the relevant period, the Office of Investigations selecting official was Assistant Director of Investigations Kenneth Jenkins. *Id.* at 20 (Pl.'s Resp. Def.'s SUMF ¶¶ 85–87). Jenkins relied heavily on recommendations from his subordinates when selecting candidates to recommend for promotion. *Id.* at 21 (Pl.'s Resp. Def.'s SUMF ¶¶ 93–94). For vacancies within FSD, Jenkins had Deputy Assistant Director Michael Breslin solicit names from the highest-ranking FSD official, Special Agent in Charge Frank Loveridge. *Id.* at 21–22 (Pl.'s Resp. Def.'s SUMF ¶¶ 93, 95); Dkt. 39-4 at 26 (Loveridge EEO Decl. ¶ 1); Dkt. 39-4 at 37 (Breslin EEO Decl. ¶ 1). Loveridge, in turn, relied on recommendations from two of his own subordinates, Assistant Special Agent in Charge Brian Leary and Assistant to the Special Agent in Charge Daniel Ciatti. Dkt. 46-1 at 22–23 (Pl.'s Resp. Def.'s SUMF ¶ 99); Dkt. 39-4 at 47 (Leary EEO Decl. ¶ 1); Dkt. 39-5 at 5 (Ciatti EEO Decl. ¶ 1).

Although Leary and Ciatti spearheaded the selection process for FSD vacancies, they were not the only officials who supervised FSD polygraph agents. Other FSD supervisors included Bill Lewis, Assistant Special Agent in Charge and head of the polygraph program until mid-2017, and Edward Alston, who was promoted to Assistant to the Special Agent in Charge in

6

August 2017.  Dkt. 46-1 at 27, 29 (Pl.'s Resp. Def.'s SUMF ¶¶ 111, 115, 117) (undisputed as to the fact of Lewis's title and role and as to the timing of Alston's promotion).  Among these officials, only Lewis and Alston were Black; Jenkins, Breslin, Loveridge, Leary, and Ciatti all were white.  Dkt. 50-1 at 40–41 (Def.'s Resp. Pl.'s SUMF ¶¶ 59–60); Dkt. 39-4 at 37 (Breslin EEO Decl. ¶ 5); Dkt 39-4 at 6 (Jenkins EEO Decl. ¶ 3); Dkt. 39-4 at 26 (Loveridge EEO Decl. ¶ 5).[3]

### 3. *Fitzig's Applications for Promotion*

#### a. Vacancy 17116

Fitzig's first failure-to-promote claim arises out of Vacancy 17116, which corresponded to two openings for non-supervisory technical staff assistant positions within FSD.  Dkt. 46-1 at 31–32 (Pl.'s Resp. Def.'s SUMF ¶ 127).  Technical staff assistants are responsible for a wide range of duties, including working with senior officials in planning and directing the functions of the office, reviewing policies and procedures, engaging in long-range planning, and liaising with senior agency officials.  Dkt. 39-6 at 46 (Def.'s Ex. 1).  According to Jenkins and Breslin, FSD was looking for candidates for this role who had excellent polygraph skills, the ability to mentor junior polygraph examiners, "strength in operations-related tasks," and leadership potential.  Dkt. 39-4 at 39 (Breslin EEO Decl. ¶ 13).

Vacancy 17116 was posted on June 2, 2017, and fifteen special agents applied for the two openings.  Dkt. 46-1 at 31–32, 35 (Pl.'s Resp. Def.'s SUMF ¶¶ 127, 142).  Fitzig was third on the best-qualified list.  Dkt. 39-6 at 33 (Def.'s Ex. 1).  His statement of qualifications highlighted, among other things, the fact that he had received three Century Awards, his mentorship of junior examiners, and his advanced polygraph training.  *Id.* at 36.  At the end of June, FSD announced

---

[3] Breslin identifies as "white/Hispanic."  Dkt. 39-4 at 37 (Breslin EEO Decl. ¶ 5).

that Special Agents Tracey Hughes and Timothy Kistler had been selected for the vacancies.
Dkt. 46-1 at 35 (Pl.'s Resp. Def.'s SUMF ¶¶ 139, 141).  Hughes and Kistler ranked fifth and
tenth, respectively, on the best-qualified list.  Dkt. 39-6 at 33 (Def.'s Ex. 1).  As was typical in
FSD, Leary and Ciatti had recommended Hughes and Kistler to Loveridge, Loveridge had
recommended them to Breslin, and Breslin had recommended them to Jenkins, who brought
them before the Advisory Board for selection.  Dkt. 40-7 at 4 (Leary Decl. ¶ 26); Dkt 40-8 at 5–6
(Ciatti Decl. ¶¶ 35–37); Dkt. 39-4 at 38–39 (Breslin EEO Decl. ¶¶ 6, 8, 12, 13); Dkt. 39-4 at 10–
11 (Jenkins EEO Decl. ¶¶ 23–30).

        b.     Vacancy 17157

     Fitzig's second claim arises out of his non-selection for Vacancy 17157, an Assistant to
the Special Agent in Charge ("ATSAIC") role within FSD.  Dkt. 46-1 at 49–50 (Pl.'s Resp.
Def.'s SUMF ¶ 202).  This was a supervisory position involving close collaboration with
Loveridge, as well as liaising with senior members of the Secret Service and federal, state, and
local law enforcement.  Dkt. 39-7 at 10 (Def.'s Ex. 1).  According to Breslin, FSD leadership
was looking for candidates with a broad variety of prior assignments, supervisory experience,
subject-matter expertise, and professional maturity.  Dkt. 46-1 at 58 (Pl.'s Resp. Def.'s SUMF
¶ 231).  The position was posted in August 2017, and eight special agents (all of whom were
promotion candidates) applied for the opening.  Id. at 50–51 (Pl.'s Resp. Def.'s SUMF ¶¶ 203,
207).  This time, Fitzig ranked second on the best-qualified list, and his application highlighted
his nine years of experience in FSD, the high volume of polygraph exams he had performed, and
his experience with polygraph quality control and mentorship.  Id. at 50 (Pl.'s Resp. Def.'s
SUMF ¶ 206); Dkt. 39-7 at 3 (Def.'s Ex. 1).  Special Agent Ellen Ripperger, who ranked seventh
on the best-qualified list, was selected for the vacancy on September 13, 2017.  Dkt. 46-1 at 50–

51, 54 (Pl.'s Resp. Def.'s SUMF ¶¶ 206, 209, 221).  Like the process used for the earlier

vacancies, Ripperger's supervisors had recommended her up the chain of command, from Leary

and Ciatti to Loveridge, Loveridge to Breslin, and Breslin to Jenkins.  Dkt. 40-7 at 4 (Leary

Decl. ¶ 32); Dkt 40-8 at 7 (Ciatti Decl. ¶ 40); Dkt. 39-4 at 41 (Breslin EEO Decl. ¶¶ 25–27); Dkt.

30-4 at 11 (Jenkins EEO Decl. ¶¶ 31).

       c.      Vacancy 17165

      Later in August 2017, Fitzig applied for Vacancy 17165, which, like Vacancy 17116,

comprised two non-supervisory technical staff assistant openings within FSD.  Dkt. 46-1 at 61

(Pl.'s Resp. Def.'s SUMF ¶ 241).  FSD sought to fill these positions with agents who were

skilled polygraph examiners and who were capable of mentoring new examiners.  Dkt. 39-4 at

43 (Breslin EEO Decl. ¶ 41).  Eleven candidates (all of whom were promotion candidates)

applied for the positions, and among these candidates Fitzig ranked second on the best-qualified

list.  Dkt. 39-7 at 15 (Def.'s Ex. 1).  As before, his statement of qualifications emphasized his

polygraph experience, strong performance, and ability to mentor.  *Id.* at 17.  On September 13,

2017, Special Agents Nicholas Hall and Lonnie Falgout, who ranked fifth and eleventh,

respectively, on the best-qualified list, were selected for the open positions.  Dkt. 46-1 at 62

(Pl.'s Resp. Def.'s SUMF ¶ 251).  Once again, Hall and Falgout's candidacies were

recommended up the FSD and Investigations leadership hierarchy.  *Id.* at 65–66, 68–69 (Pl.'s

Resp. Def.'s SUMF ¶¶ 269, 274, 279, 281–83, 287)

       d.      Vacancy 17209

      In November 2017, Fitzig applied for vacancy 17209, an ATSAIC position in the Newark

field office.  Dkt. 38-2 at 40 (Def.'s SUMF ¶ 294); Dkt. 46-1 at 72 (Pl.'s Resp. Def.'s SUMF

¶ 294).  This was a supervisory position and a generalist role; ATSAICs in the Newark office

typically supervise squads of special agents and support personnel across a variety of different agency functions, including investigations, intelligence, recruitment, and protective efforts.  Dkt. 41-12 at 2 (McKevitt Decl. ¶¶ 10–11).  Because this position was in the Newark field office, the selection process ran a slightly different course than did the process used for the FSD vacancies. Jenkins was still the selecting official, and, as before, he received recommendations from Breslin.  Dkt. 46-1 at 73 (Pl.'s Resp. Def.'s SUMF ¶¶ 299–300).  But rather than asking Loveridge (and thus Leary and Ciatti) for recommendations, Breslin relied on Mark McKevitt, the Special Agent in Charge of the Newark office; Loveridge, Leary, and Ciatti were not involved in the selection for this opening.  *Id.* at 73, 78 (Pl.'s Resp. Def.'s SUMF ¶¶ 300, 327–28).  Twenty-six candidates applied for the position, and Special Agent Michael Fagan was ultimately selected.  *Id.* at 72, 73 (Pl.'s Resp. Def.'s SUMF ¶¶ 297, 303).  Fagan placed fifteenth on the best-qualified list for this vacancy; Fitzig placed fourth.  Dkt. 41-10 at 1–2 (Def.'s Ex. 20).

       e.     Vacancy 17195

The final vacancy at issue is Vacancy 17195, which corresponded to two ATSAIC roles in the Airspace Security Branch of the Special Operations Division of the Office of Protective Operations.  Dkt. 46-1 at 79 (Pl.'s Resp. Def.'s SUMF ¶ 330).  These were not polygrapher positions and were not part of FSD or the Investigations division more broadly.  *Id.* at 89–90 (Pl.'s Resp. Def.'s SUMF ¶ 381); Dkt. 40-9 at 1 (Buster Decl. ¶ 4).  As a result, none of the usual suspects were involved in the selection.  Assistant Director of the Office of Protective Operations Robert Buster was the selecting official, and he in turn worked closely with Special Agent in Charge of the Special Operations Division Mark Habersaat in making selections.  Dkt. 40-9 at 1 (Buster Decl. ¶ 4); Dkt. 39-5 at 12 (Buster EEO Decl. ¶ 8); Dkt. 41-2 at 2 (Habersaat Decl. ¶¶ 9–

10).  In evaluating candidates for this vacancy, Buster and Habersaat looked for agents with strong leadership experience and potential, as evidenced by the candidates' breadth of experiences, level of responsibility, accomplishments, mentorship track record, and experience working with internal and external partners.  Dkt. 41-2 at 2 (Habersaat Decl. ¶¶ 14–15); Dkt. 40-9 at 3 (Buster Decl. ¶ 16); Dkt. 39-5 at 13 (Buster EEO Decl. ¶ 11).  In Buster's view, differences between the MPP rankings of candidates who scored high enough to be eligible for the position were not important, and he did not consider those differences.  Dkt. 40-9 at 2–3 (Buster Decl. ¶¶ 14–15).  Thirty-one candidates made the best-qualified cutoff for this role, and Special Agents Timothy Desmond and Linda Canfield were selected for the positions.  Dkt. 46-1 at 79, 80 (Pl.'s Resp. Def.'s SUMF ¶¶ 335, 340).  Fitzig ranked eleventh, Canfield twenty-third, and Desmond twenty-sixth on the best-qualified list.  46-1 at 80–81 (Pl.'s Resp. Def.'s SUMF ¶¶ 337, 345–46).

### B.   Procedural History

Fitzig exhausted his administrative remedies throughout 2017 and 2018 and filed this lawsuit on November 5, 2018.  Dkt. 3 at 3 (Compl. ¶¶ 8–13).  The Complaint alleges that in failing to promote Fitzig numerous times between 2010 and 2017, the Secret Service discriminated against him on the basis of his race, color, national origin, age, and prior protected activity and subjected him to a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964.  Dkt. 3 (Compl.).  After the Secretary moved to dismiss the case in part, Fitzig agreed to drop his national origin and age discrimination claims, his hostile work environment claim, and all claims associated with non-selections prior to 2017.  Dkt. 18; Dkt. 19; Min. Order (Feb. 4, 2020).  The Secretary has now moved for summary judgment on Fitzig's remaining claims.  Dkt. 38.

## II.  LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[ ] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the outcome of the litigation under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera*, 638 F.3d at 308.

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

In conducting this analysis, the Court "review[s] the record . . . as a whole." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). But at summary judgment, it is not the Court's function to "weigh the evidence," *Liberty Lobby*, 477 U.S. at 249, or "to make credibility determinations," *Wheeler*, 812 F.3d at 1113, in order to determine "the truth of the matter," *Liberty Lobby*, 477 U.S. at 249.

## III.  ANALYSIS

Fitzig alleges that the Secret Service failed to promote him for both discriminatory and retaliatory reasons. The Court will consider each category of claims in turn.

### A.    Discrimination Claims

Title VII provides that  "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race [or] color." 42 U.S.C. § 2000e–16(a). A plaintiff like Fitzig who lacks direct evidence of discrimination must rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to make out his case. Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Holcomb*, 433 F.3d at 895. In a failure-to-promote case, this means that the plaintiff must prove by a preponderance of the evidence that "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants." *Id.* (internal quotation marks omitted). Once a plaintiff makes out a prima facie case, the burden

shifts to the employer, who must "articulate a legitimate, nondiscriminatory reason for its action." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (internal quotation marks omitted).  "If the employer meets its burden of production, the burden then shifts back to the employee, who must prove that, despite the proffered [nondiscriminatory] reason, she has been the victim of intentional discrimination." *Id.* at 1086 (internal quotation marks omitted).  Doing so entails demonstrating that a reasonable jury could find that the employer's purported reason for not promoting the plaintiff was pretextual and that the actual reason was intentional discrimination.  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019).

In *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), the D.C. Circuit added a twist to the *McDonnell Douglas* framework, holding that when "an employer has asserted a legitimate, non-discriminatory reason for [its] decision, the district court need not— *and should not*—decide whether the plaintiff actually made out a prima facie case" at *McDonnell Douglas* step one.  Instead, the court must turn directly to *McDonnell Douglas* step three and the ultimate issue of whether the employer intentionally discriminated against the employee or not. *Id.*  But the "*Brady* shortcut" applies only if the employer has truly satisfied its burden of production.  *Figueroa*, 923 F.3d at 1087.  In *Figueroa v. Pompeo*, 923 F.3d 1078, the D.C. Circuit clarified that aspect of *Brady*'s refinement to the *McDonnell Douglas* framework.  Under *Figueroa*, an employer's purportedly legitimate justifications for its action must be "[]sufficiently substantiated" in order for a court to proceed directly to *McDonnell Douglas* step three.  923 F.3d at 1087.  A vague or conclusory explanation will not do.  *Id.* at 1088.  Several factors are "paramount" in making this assessment: (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding);" (2) the evidence must be such that if the factfinder believed it, the factfinder could "reasonably . . . find that the

employer's action was motivated by a nondiscriminatory reason;" (3) "the nondiscriminatory explanation must be legitimate"—that is, "facially credible in light of the proffered evidence;" and (4) "the evidence must present a clear and reasonably specific explanation," because a plaintiff "cannot be expected to disprove" an explanation that has not "been articulated with some specificity." *Id.* at 1087–88 (internal citations and quotation marks omitted).

Applying this reticulated framework, the Court must begin its analysis at *McDonnell Douglas* step two and decide whether the explanations for not promoting Fitzig that the Secret Service has proffered pass muster under *Figueroa*. Only after assuring itself of the sufficiency of these reasons may the Court consider whether a reasonable jury could conclude that they are pretextual.

### 1. The Secret Service's Justifications for Not Promoting Fitzig

It is helpful at the outset to review again how the promotion process functioned for the vacancies at issue, in particular those in FSD. For the FSD vacancies (Vacancies 17116, 17157, and 17165), Leary and Ciatti recommended candidates to Loveridge, who recommended them to Breslin, who recommended them to Jenkins (the selecting official), who brought them to the Advisory Board. There is no evidence that Jenkins and Breslin took issue with Loveridge's recommendations or even that they relied on any factors independent of those on which Loveridge (and Leary and Ciatti) relied. As a result, although Jenkins was the selecting official, the substantive reasons for Fitzig's non-selection are those that motivated Leary, Ciatti, and Loveridge, the officials most involved in weighing the merits of the applicants. A similar process was used for the non-FSD vacancies, just with different personnel. This multi-step decision-making procedure is no barrier to liability, however. If one decisionmaker acts at the behest of another, and the latter is motivated by an impermissible purpose, that purpose infects the ultimate decision and the employer can be held liable. *See Staub v. Proctor Hosp.*, 562 U.S.

411, 422 (2011) (discussing "cat's paw" theory of liability); *Noisette v. Lew*, 211 F. Supp.3d 73, 94 (D.D.C. 2016).

Bearing that in mind, the Court turns to the FSD vacancies. The same decisionmakers selected the candidates for each of these vacancies, and they gave essentially the same justifications for not selecting Fitzig each time. The Court will therefore consider these vacancies together. In each instance, Leary, Ciatti, and Loveridge contend that the other candidates were better qualified than Fitzig. In support of that contention, they extol the credentials and qualifications of the candidates they selected and point to concerns that they assertedly had about Fitzig's judgment, professionalism, and leadership potential.

The Court begins with the qualifications of the selected candidates. The Court will not recount the resumes of the selectees in detail, because it does so below at the next stage of the analysis. It suffices for the moment to say that the Secret Service relies upon the resumes and strong track records of Hughes, Kistler, Ripperger, Hall, and Falgout and specifies why they were well qualified for the roles for which they were selected. *See generally* Dkt. 46-1 at 31–72 (Pl.'s Resp. Def.'s SUMF ¶¶ 127–293). For Vacancy 17116, the Secret Service also highlights that Hughes and Kistler had strong reputations, noting in particular that Leary, their supervisor, believed that Hughes was "well respected by other examiners," *id.* at 36 (Pl.'s Resp. Def.'s SUMF ¶ 146), and that Kistler had "proven [his] leadership skills in a relatively short time [within FSD]" and had "an excellent demeanor and a great amount of professionalism," Dkt. 39-4 at 28 (Leary EEO Decl. ¶ 12). Loveridge had also worked directly with Hughes and Kistler, and he contends that their performance had "impressed" him. Dkt. 46-1 at 39–40 (Pl.'s Resp. Def.'s SUMF ¶ 159). Similarly, as to Vacancy 17157 the Secret Service emphasizes Ripperger's strong qualifications and reputation as a "top-level examiner," as well as Loveridge's belief that

she had "organizational skills, attention to detail, administrative skills, and communications skills, all of which were needed for the position." *Id.* at 52–53 (Pl.'s Resp. Def.'s SUMF ¶¶ 214, 219). And for Vacancy 17165, the Secret Service lauds the qualifications and strong reputations of selectees Hall and Falgout, in particular Hall's experience as a mentor and quality control examiner and Falgout's decorated tenure as an agent. *See id.* at 63–65 (Pl.'s Resp. Def.'s SUMF ¶¶ 257–60, 264–69).

More importantly, the Secret Service explains why in each instance Leary and Ciatti did not recommend Fitzig. According to Leary and Ciatti, Fitzig had "demonstrated questionable judgment and poor decision-making skills," which gave them pause regarding his "potential as a manager and a leader" and led them to doubt his "professionalism" and "judgment." *Id.* at 42–44, 54–56, 66–68 (Pl.'s Resp. Def.'s SUMF ¶¶ 174–81, 224–28, 275–78). Specifically, Leary recalled an instance in which Fitzig "was removed as a Quality Control Examiner" and a further incident in which Fitzig allegedly called a colleague on a weekend and impersonated that colleague's supervisor in an effort to obtain information from the colleague. *Id.* at 43, 55, 66 (Pl.'s Resp. Def.'s SUMF ¶¶ 176, 225, 275); Dkt. 40-7 at 5 (Leary Decl. ¶ 37). Likewise, Ciatti detailed negative experiences in which Fitzig had abruptly hung up on a phone call with him and Leary and sent an email to Ciatti's supervisor that Ciatti believed "grossly misinterpreted" Ciatti's prior communications with Fitzig. *Id.* at 43–44, 56, 67–68 (Pl.'s Resp. Def.'s SUMF ¶¶ 176–80, 226–28, 276–78). Ciatti also noted that Fitzig had been subjected to two quality control checks because the polygraph operations team did not concur with Fitzig's evaluations of polygraph exams. *Id.* at 43–44, 55–56, 66–68 (Pl.'s Resp. Def.'s SUMF ¶¶ 176–80, 225–28, 275–78). Collectively, these incidents convinced Leary, Ciatti, and Loveridge that Fitzig was not ready to advance to the GS-14 level.

These justifications for not promoting Fitzig suffice under *Figueroa*.  The Secret Service has submitted declarations from Leary, Ciatti, Loveridge, Breslin, and Jenkins (and a deposition of Loveridge) containing the representations set forth above, and those materials constitute competent summary judgment evidence.  Dkt. 39-4 at 36–45 (Breslin EEO Decl.); Dkt. 40-2 (Loveridge Dep.); Dkt. 40-7 (Leary Decl.); Dkt. 40-8 (Ciatti Decl.); 41-1 (Jenkins Decl.); *see also Figueroa*, 923 F.3d at 1087.  If believed, these explanations would allow a reasonable factfinder to conclude that the Secret Service declined to promote Fitzig for nondiscriminatory reasons.  *Figueroa*, 923 F.3d at 1087.  The alleged incidents that Leary and Ciatti recount reflect poorly on Fitzig and could justify selecting other candidates, in particular given those candidates' strong credentials.  The explanations are also "facially credible in light of the proffered evidence."  *Id.* at 1088 (internal quotation marks omitted).  Finally, although general statements about leadership potential and reputation might fall short of *Figueroa*'s reasonable specificity requirement, the Secret Service provided concrete examples of Fitzig's conduct to support their application of these otherwise subjective criteria.  *Figueroa* cited favorably to *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003), in which an employer provided the general justification that a candidate selected for promotion was "more qualified" with a "more keen interest in management" than the plaintiff but backed up these statements with examples, such as the plaintiff's "rare[]" attendance at management meetings, complaints the plaintiff had received about his management, and the slipshod job application he had submitted.  *Figueroa*, 923 F.3d at 1091 (citing *Stewart*, 352 F.3d at 428–29).  That was enough to proceed to step three of the analysis, because the employer had "put the plaintiff on notice of what reasoning he must challenge."  *Id.*  The same is true here.

The Secret Service's explanation for selecting Fagan instead of Fitzig for Vacancy 17209 is different, because McKevitt, rather than Leary, Ciatti, and Loveridge, was the key individual in the selection process.  Dkt. 46-1 at 73, 78 (Pl.'s Resp. Def.'s SUMF ¶¶ 300, 327–28). According to McKevitt, he recommended Fagan rather than Fitzig because Fagan had a broader diversity of experiences than Fitzig did, which was important for the multifaceted, generalist position at issue.  *Id.* at 76–77 (Pl.'s Resp. Def.'s SUMF ¶ 320).  McKevitt stressed that Fitzig "had spent the most recent 9–10 years of his career as a polygrapher assigned to [FSD]," rather than performing a broader variety of agency responsibilities, something that in McKevitt's view worked against Fitzig.  Dkt. 41-12 at 4 (McKevitt Decl. ¶ 32); Dkt 46-1 at 76–77 (Pl.'s Resp. Def.'s SUMF ¶ 320).  McKevitt also noted that he had worked directly with Fagan and had "witnessed first[]hand" that the "productiv[ity] [of] the advance team dropped significantly when [] Fagan was not involved in some capacity" in the advance planning, whereas he had no such track record with Fitzig.  Dkt. 41-9 at 2 (Def.'s Ex. 19); Dkt. 46-1 at 76–77 (Pl.'s Resp. Def.'s SUMF ¶¶ 318, 321).  These justifications too are sufficient under *Figueroa*.  They are presented in admissible form (a declaration from McKevitt and his written recommendation of Fagan), constitute reasonable bases for selecting Fagan over Fitzig, and are facially credible and reasonably specific.  *Figueroa*, 923 F.3d at 1087–88.

According to the Secret Service, Fitzig's relative lack of diverse experience and support from his supervisors also cost him Vacancy 17195.  Buster, the selecting official, explained that diversity of experience was a "significant factor" in his evaluation of the candidates, because it was indicative of leadership skills and potential, which were of paramount importance to him. Dkt. 40-9 at 3 (Buster Decl. ¶ 21); Dkt. 46-1 at 82, 88 (Pl.'s Resp. Def.'s SUMF ¶¶ 350–53, 377).  In his view and that of Habersaat, the individuals selected for this vacancy, Desmond and

Canfield, had a greater diversity of experience than Fitzig did.  Dkt. 46-1 at 86 (Pl.'s Resp.

Def.'s SUMF ¶ 371).  Desmond had served in five assignments at the time of his selection,

including in the Boston field office, Frankfurt resident office, Vice Presidential Protective

Division, International Programs division, and Airspace Security Branch.  *Id.* at 83 (Pl.'s Resp.

Def.'s SUMF ¶ 356).  He also had other leadership credentials, including serving as the Secret

Service's representative on the FBI's Joint Terrorism Task Force and as whip of multiple units

and Acting Assistant to the Special Agent in Charge of the counter-surveillance unit.  *Id.* at 83–

84 (Pl.'s Resp. Def.'s SUMF ¶¶ 357–59).  Canfield, for her part, had served in the New York,

White Plains, and Washington offices and on both Dignitary and Presidential Protection Details.

*Id.* at 84–85 (Pl.'s Resp. Def.'s SUMF ¶ 364).  From Buster and Habersaat's perspective,

Desmond and Canfield's experiences were more diverse than those of Fitzig.  *Id.* at 86–88 (Pl.'s

Resp. Def.'s SUMF ¶¶ 371–72, 377).  In addition, Buster and Habersaat stressed that Canfield

and Desmond had more experience with the Secret Service's airspace mission and the special

operations branch than did Fitzig, who had spent the last ten years as a polygrapher.  *Id.* at 87–88

(Pl.'s Resp. Def.'s SUMF ¶¶ 373–74).  Buster believed that spending a decade in one position

was "not the norm for someone seeking promotion and reflected a certain staleness of experience

which worked against [Fitzig]."  Dkt. 40-9 at 4 (Buster Decl. ¶ 25); Dkt. 46-1 at 89 (Pl.'s Resp.

Def.'s SUMF ¶ 378).  Finally, unlike Canfield, Fitzig did not receive a recommendation from

anyone in his chain of command.  Dkt. 46-1 at 86, 89 (Pl.'s Resp. Def.'s SUMF ¶¶ 370, 379).

These reasons also satisfy *Figueroa*.  923 F.3d at 1087.  The Secret Service offered

competent evidence to support those justifications and, if true, they provide a reasonable basis

for the decision to select Desmond and Canfield rather than Fitzig.  *Id.*  They are also facially

credible, and Buster and Habersaat articulated them with ample specificity.  *Id.* at 1088.

2.    *Pretext*

Because the Secret Service has come forward with legitimate, non-discriminatory reasons for not selecting Fitzig, the Court will proceed to step three and determine whether a reasonable jury could find that these reasons were pretextual and that the real reasons for not selecting Fitzig were discriminatory.  *See Brady*, 520 F.3d at 494.

a.    Fitzig's Race and Color

Before turning to the main portion of the analysis, the Court must address two threshold issues related to Fitzig's race and color.  Fitzig contends that he was discriminated against because he is Black and because he has multiracial coloring.  Dkt. 3 at 17 (Compl. ¶ 74).  The Secret Service argues that the officials involved in the selections for the vacancies in question could not have discriminated against Fitzig because he was Black, because they did not know he was Black.  Dkt. 38-1 at 50; Dkt. 50 at 11.  According to the Secret Service, most of Fitzig's colleagues did not believe him to be Black, and he had previously represented that he was "Native American/Alaskan."  Dkt. 50 at 11.  But Fitzig responds that it is readily apparent from his appearance that he is a multiracial Black man.  Dkt. 46 at 5–6.  The Court cannot resolve at summary judgment whether Fitzig's race is discernable from his appearance, nor whether the relevant decisionmakers (or those who influenced the promotion decisions) knew or believed that he is Black.  So the Secret Service's lack-of-knowledge arguments fail.

For similar reasons, the Court cannot grant summary judgment to the Secret Service based on the fact that Fitzig represented to the agency that he was Native American/Alaskan. Dkt. 50 at 11; Dkt. 39-7 at 34 (Def.'s Ex. 1).  For one thing, Fitzig maintains that he is mixed race, Dkt. 46 at 5, so the fact that he represented himself as Native American/Alaskan would not preclude his also being Black.  For another, if any of the decisionmakers (or those who

influenced the promotion process) knew or believed that he is Black, it does not matter (at least for purposes of this motion) whether he filled out a form at some point saying that he was Native American/Alaskan.  Finally, Fitzig could have faced discrimination based on his "color," even if the particular racial identity associated with his complexion was not obvious.

Relatedly, the Court will treat Fitzig's race and color claims as a single category of claim. Courts often treat color discrimination claims as subsumed into race discrimination claims.  *See, e.g.*, *Rodriguez v. Wash. Metro Transit Auth.*, No. 19-3710, 2021 WL 3722729, at *5 (D.D.C. Aug. 23, 2021); *Howard v. D.C. Pub. Schs.*, 501 F. Supp. 2d 116, 121 n.15 (D.D.C. 2007); *Felix v. Marquez*, No. 78-2314, 1980 WL 242, at *1 (D.D.C. Sept. 11, 1980) (noting that "[c]olor may be a rare claim, because color is usually mixed with or subordinated to claims of race discrimination").  That approach is appropriate here.  Fitzig has provided no independent evidence of discrimination that was based—discretely—on race or based—discretely—on color. So for the sake of clarity, and because no part of the Court's disposition would change if it analyzed Fitzig's race and color claims separately, the Court will treat all of his claims as race discrimination claims.

b.    Race Discrimination Pretext Analysis

At step three of the governing framework, Fitzig bears the burden of demonstrating that a reasonable jury could find that the Secret Service's justifications for not promoting him are pretextual and that its real reasons were discriminatory.  Because a "factfinder's disbelief of the reasons put forward by the defendant" may support to an inference of discrimination, rebutting an employer's justifications may, at times, suffice to counter an employer's motion for summary judgment.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  To assess whether Fitzig has met his burden here, the Court must consider "the total circumstances of the case" and ask

"whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (internal quotation marks omitted). Having done so, the Court concludes that there is sufficient evidence—although just barely—for a reasonable jury to find that the Secret Service's explanations for not selecting Fitzig for the FSD vacancies (Vacancies 17116, 17157, and 17165) were pretextual and that its real reasons were discriminatory. No reasonable jury, however, could reach this same result for the non-FSD vacancies (Vacancies 17209 and 17195).

<blockquote>i.    *The FSD Vacancies: Vacancies 17116, 17157, and 17165*</blockquote>

Because the FSD vacancies all present essentially the same issues, the Court will analyze them together. To recap: Fitzig was not selected for any of these three vacancies because Ciatti, Leary, and Loveridge did not recommend him. Dkt. 46-1 at 42, 54, 66 (Pl.'s Resp. Def.'s SUMF ¶¶ 174, 222, 270). Ciatti and Leary contend that they did not recommend Fitzig because the other candidates were better qualified and, in particular, because they harbored doubts about his judgment, decisionmaking, professionalism, communication abilities, and leadership potential. *Id.* at 42–44, 54–56, 66–68 (Pl.'s Resp. Def.'s SUMF ¶¶ 174–81, 224–28, 275–78). Several incidents purportedly drove these concerns: Fitzig's removal as a quality control examiner, an incident in which Fitzig called a colleague and impersonated someone else, a situation in which Fitzig abruptly hung up the phone on Ciatti and Leary, an email Fitzig sent to Ciatti's supervisor that Ciatti contends "grossly misinterpreted prior communications," and the fact that Fitzig had twice been the subject of a quality control check because the polygraph operations team did not

concur with his evaluations of a polygraph exam. *Id.* at 43–44, 55–56, 66–67 (Pl.'s Resp. Def.'s SUMF ¶¶ 176–80, 225–28, 275–78). Loveridge, in turn, explained that he relied on Ciatti and Leary's recommendations. Dkt. 40-2 at 48 (Loveridge Dep. 185: 5–22, 186: 1–22, 187: 1–11). Fitzig's task is to show that a reasonable jury could believe that these proffered justifications are pretextual and that Ciatti, Leary, and Loveridge intentionally discriminated against him. *Cruz v. McAleenan*, 931 F.3d 1186, 1191 (D.C. Cir. 2019).[4]

Fitzig's lead argument is that his qualifications were superior to those of the agents selected for these vacancies and that this discrepancy gives rise to an inference of discrimination. Dkt. 46 at 23–33. Although a gap in qualifications can sometimes show that an employer's proffered justification for its actions is pretextual, the bar is a high one. The D.C. Circuit has recognized that "[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Holcomb*, 433 F.3d at 897 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)). The court has further explained that "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." *Fischbach v. D.C. Dept. of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Accordingly, to survive summary judgment based on a disparity in qualifications alone, an employee must show that "the qualifications gap 'is great enough to be inherently indicative of discrimination.'" *Hamilton*, 666 F.3d at 1352 (quoting *Holcomb*, 433 F.3d at 897). Such an inference is reasonable where a

---

[4] Although Breslin and Jenkins were also involved in the FSD vacancy decisions, there is very little evidence regarding their decision-making beyond the fact that they concurred with Loveridge's recommendations, and, in any event, the Court's analysis of the evidence regarding Leary, Ciatti, and Loveridge is sufficient for it to deny summary judgment as to these vacancies.

plaintiff is "markedly more qualified," "substantially more qualified," or "significantly better qualified" than those chosen over him.  *Id.*  If that is true, "the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture."  *Aka*, 156 F.3d at 1294.

Fitzig's qualifications arguments do not get him very far.  Any discrepancies between his qualifications and those of the individuals selected for the vacancies in question are not substantial enough to give rise to a reasonable inference of discrimination.  Starting with the basics, all of the successful candidates were highly experienced with tenures similar to Fitzig's: Fitzig had spent nineteen years with the Secret Service as compared to Hughes and Kistler's eighteen, Ripperger's sixteen, Hall's fifteen, and Falgout's seventeen.  Dkt. 46-1 at 1, 36, 37, 51, 63, 64 (Pl.'s Resp. Def.'s SUMF ¶¶ 2, 144, 148, 210, 255, 261–62).  And like Fitzig, all of the agents besides Ripperger had worked in multiple field offices.  *Id.* at 1–2, 36, 37, 52–53, 63, 64 (Pl.'s Resp. Def.'s SUMF ¶¶ 3, 5–6, 145, 149, 215–16, 255, 263).  Although Ripperger had not done so, she had taken on significant responsibility in the Washington office.  *Id.* at 52–53 (Pl.'s Resp. Def.'s SUMF ¶¶ 215–16).  Similarly, all of the selectees besides Ripperger had, like Fitzig, spent multiyear stints in presidential, vice presidential, or former presidential protection work. *Id.* at 1–2, 36, 37, 51, 53, 63, 64 (Pl.'s Resp. Def.'s SUMF ¶¶ 4, 145, 149, 211, 217, 256, 263). And Ripperger, for her part, had spent several years with the Protective Intelligence and Assessment Division and served as a quality control examiner.  *Id.* at 51, 53 (Pl.'s Resp. Def.'s SUMF ¶¶ 211, 217).  All of the candidates, including Fitzig, had strong reputations.  Dkt. 46-1 at 36, 38, 39, 52, 53, 63, 64–65,  (Pl.'s Resp. Def.'s SUMF ¶¶ 146, 152, 156, 214, 219, 257, 264, 266–67); *id.* at 96 (Pl.'s SUMF ¶¶ 25–28).  Fitzig disputes whether this was true of Ripperger,

but he provides little evidence beyond his own say-so in support of this proposition. *Id.* at 52 (Pl.'s Resp. Def.'s SUMF ¶ 214).  Loveridge also acknowledged that he had some concerns about Ripperger arising out of a conflict that she had with Fitzig, but he explained that Ciatti and Leary nevertheless convinced him that Ripperger was the best-qualified candidate.  Dkt. 40-2 at 53 (Loveridge Dep. 207:1–20).  Finally, although Fitzig had a higher MPP score than did any of the selected candidates, Dkt. 39-6 at 33 (Def.'s Ex. 1); 39-7 at 1, 15 (Def.'s Ex. 1); Dkt. 46-1 at 1, 36, 37, 51, 63, 64 (Pl.'s Resp. Def.'s SUMF ¶¶ 2, 144, 148, 210, 255, 261–62), there are other puts and takes—titles some held that others did not, commendations some received and others did not, and the like—which render comparisons inexact.

Any disparities that did exist between Fitzig's qualifications and those of the selected candidates fall short of those courts have previously held sufficient to give rise to an inference of discrimination.  In *Aka v. Washington Hospital Center*, for example, the D.C. Circuit held that discrimination could be inferred because the plaintiff, who had not been selected for a position at a pharmacy, had undergraduate and graduate degrees and nineteen years of relevant experience, whereas the individual selected for the position had no college degree and less than one year of experience at a hospital laundry.  156 F.3d at 1295–96.  The D.C. Circuit reached a similar conclusion in *Stoe v. Barr*, where the plaintiff had already successfully performed the duties of the role in question for many years, had previously supervised the candidate chosen for the position, and had twelve more years of experience at the relevant agency than did the chosen candidate.  960 F.3d 627, 640–41 (D.C. Cir. 2020).  And in *Hamilton v. Geithner*, the D.C. Circuit observed that it was a "relatively close question" whether a candidate with nineteen years of experience in industrial safety and a master's degree, among other credentials, was "significantly" or "markedly" more qualified for purposes of pretext analysis than a candidate

with "no college degree and little formal training in occupational safety" but who had "eight years of substantive safety experience."  666 F.3d at 1352–53; *see also Lathram v. Snow*, 336 F.3d 1085, 1092 (D.C. Cir. 2003) (denying summary judgment in a non-selection case related to a public affairs role where there was "a wide and inexplicable gulf between the qualifications" of the plaintiff, who had years of public affairs experience and had already performed much of the work for the role in question, and the selectee, an "unemployed former journalist").  Any gap in qualifications here—even with respect to Ripperger, where any such gap was arguably the greatest—does not approach what the D.C. Circuit has held is sufficient, at least standing alone, to support an inference of discrimination.  Fitzig, for his part, has failed to identify a single case in which facts resembling those in this case were found to be indicative of pretext.

But that does not end the inquiry.  Although Fitzig cannot defeat summary judgment based on a comparison of qualifications alone, he points to other considerations that, in combination with the comparison evidence and other evidence, allow him to do so.  *Holcomb*, 433 F.3d at 897 (noting that a plaintiff is "not require[d] to establish [a] disparity [in qualifications] in order to survive a motion for summary judgment").  This does not mean that the Court is convinced that Fitzig was, in fact, denied these promotions because of his race or color.  That is a question for the jury.  The Court merely concludes that he has produced enough evidence—and just enough evidence—to take the case to trial.

*First*, Fitzig's supervisors arguably gave more credence to evidence that counted against Fitzig than evidence that spoke well of him.  It is well-established that "shifting and inconsistent justifications are probative of pretext," *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (internal quotation marks and citation omitted), and the same principle applies to internal inconsistency in how a supervisor evaluates a candidate.  Viewing the evidence in the light most

27

favorable to Fitzig as the nonmoving party, one such inconsistency can be identified in Ciatti's

explanation of how he evaluated the candidates.  Ciatti claimed that he did not consider the

candidates' relative MPP scores when assessing them.  Dkt. 40-8 at 4 (Ciatti Decl. ¶ 23).  He said

that instead he looked for the following characteristics: communication, teamwork, cooperation,

representation of the agency, technical proficiency, work ethic, decision-making,

professionalism, leadership/potential for leadership, and peer respect.  Dkt. 38-2 at 16 (Def.'s

SUMF ¶ 110).  The difficulty is that the MPP was apparently designed, at least in part, to

measure those very qualities.  Although the parties dispute exactly what criteria the MPP aimed

to measure, Dkt. 50-1 at 32–33 (Def.'s Resp. Pl's SUMF ¶ 45), even accepting the Secret

Service's account as the correct one, their overlap with the criteria Ciatti claimed to emphasize is

striking.  The competencies the MPP apparently tested for included: "Communicating

Effectively" (as compared to "communication");  "Relate to Others" (as compared to "teamwork"

and "cooperation"); "Knowledge of Investigative Procedures & Techniques" (as compared to

"technical proficiency"); "Judgment" and "Decisiveness" (as compared to "decision-making");

"Conscientiousness" (as compared to "professionalism"); and "Lead Others" (as compared to

leadership/potential for leadership).  Dkt 39-9 at 4–8 (Pl.'s Ex. 1).

The arguable disconnect between the low value Ciatti placed on the MPP and the high

value he placed on the characteristics the MPP measured might support an inference that Ciatti's

proffered reasons were pretextual.  After all, if (as Ciatti claimed) he was focused on fairly

assessing, for example, Fitzig's leadership, decisionmaking, and communications skills, Dkt. 40-

8 at 8 (Ciatti Decl. ¶ 47), a reasonable jury might wonder why he discounted Fitzig's

outperformance on a test designed to measure those very attributes and, instead, focused on

things that arguably called Fitzig's leadership abilities, judgment, and communication skills into

doubt.  A further and related problem arises from the fact that the Secret Service created an ostensibly *objective* metric to measure the competencies Ciatti claimed to value, yet Ciatti ignored that metric in favor of his own *subjective* assessment of these competencies.  An employer is, of course, permitted to rely on subjective assessments when making promotion decisions.  *Aka*, 156 F.3d at 1298.  But courts must treat "explanations that rely heavily on subjective considerations with caution," because subjective criteria may be used to "camouflage" discrimination.  *Id.*  Such caution appropriately turns to skepticism where, as here, an employer entirely discounts a more objective assessment of certain criteria in favor of a wholly subjective assessment of essentially the same criteria, *see Hamilton*, 666 F.3d at 1356, and that subjective measure, time and again, works to the disadvantage of a highly ranked employee who is a member of a protected class.

*Second*, Fitzig has marshaled some evidence that a reasonable jury might conclude casts doubt on whether the episodes that Ciatti and Leary recount actually concerned them as much as they say.  Most significant is the last performance evaluation Fitzig received prior to his non-selection for the vacancies at issue.  It rated him "outstanding"—the highest rating available—on the specific competencies of "[c]ommunication" and "[r]epresenting the [a]gency."  Dkt. 39-8 at 2 (Def.'s Ex. 1).  This assessment is directly at odds with Ciatti's asserted concerns about, among other things, Fitzig's communication and professionalism.  Dkt. 38-2 at 26 (Def.'s SUMF ¶ 177).  On its own, this disconnect might not prove much; an employee could perhaps be outstanding in his current role but still be unprepared for a promotion, or an employer might routinely inflate annual evaluations.  But in that same review Leary wrote: "It is expected that SSA Fitzig will assume additional leadership responsibilities within the USSS Polygraph Program in the future."  Dkt. 39-8 at 3 (Def.'s Ex. 1).  It was not long after writing this, however, that Leary declined to

recommend Fitzig for such "additional leadership responsibilities" because of his purported

concerns about Fitzig's "potential as a . . . leader."  Dkt. 38-2 at 26 (Def.'s SUMF ¶ 176).

The disconnect in Leary's assessments of Fitzig is all the more striking because,

according to Loveridge, Leary told him "that he [i.e., Leary] would rather have [Vacancy 17116]

remain unfilled than recommend SA Fitzig for the position."  Dkt. 39-4 at 28 (Loveridge EEO

Decl. ¶ 13).  It is one thing to say that a highly regarded employee was denied promotion because

another highly regarded employee edged him out.  It is an entirely different matter, however, to

rate an employee as "outstanding" in the relevant competency, to tell him that "[i]t is expected

that" he will assume greater responsibilities in the office at issue, and to then inform the

recommending official that it would better to leave a vacancy unfilled than to promote that

"outstanding" employee.  A positive evaluation that is inconsistent with an employer's asserted

justification for taking a challenged action can suggest pretext, *see Giles v. Transit Emps. Fed.*

*Credit Union*, 794 F.3d 1, 7 (D.C. Cir. 2015), and, here, a reasonable jury could make such an

inference.  The Secret Service responds that Leary's comment in Fitzig's evaluation pertained

only to his expectations for Fitzig's current role and did not address Fitzig's suitability for a

promotion.  Dkt. 50-1 at 21 (Def.'s Resp. Pl.'s SUMF ¶ 29).  Perhaps that is true.  But a

reasonable jury could find that Leary changed his story and was offering a post hoc rationale for

his strong opposition to Fitzig assuming the very additional responsibilities that he earlier

"expected" Fitzig to assume.

*George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), is instructive on this issue.  In that case,

the EPA had discharged the plaintiff, purportedly because of "problems associated with her

conduct and performance, including problems interacting with other staff, making rude

comments and loud outbursts which affected the morale of the office, and deficiencies in

performance." *Id.* at 413 (internal quotation marks omitted).  To show pretext, the plaintiff

relied heavily on a performance review, which stated that she "routinely me[t] her deadlines, that

she work[ed] effectively with office staff, and that her work require[d] no more than minor

revisions and show[ed] considerable thought, insight and creativeness." *Id.* at 414 (cleaned up)

(internal quotation marks omitted).   The D.C. Circuit held that this evidence provided a sound

basis for inferring that the EPA's justification for terminating the plaintiff was pretextual,

notwithstanding the court's recognition that the record also "contain[ed] evidence to support

EPA's claim that [the plaintiff] had conduct and performance deficiencies." *Id.* (internal

quotation marks omitted).  The situation here is similar: Ciatti and Leary assert that they doubted

Fitzig's professionalism, communication skills, and leadership potential.  Yet his performance

review—to which at least Leary contributed—paints a different picture.  "[A] jury may

ultimately decide to credit" the views expressed in this litigation over those in Fitzig's

performance review, but that is not a matter for summary judgment.  *Id.* at 413.

  *Third*, the combination of Loveridge's decision not to speak to Fitzig's Black supervisors

and the explanations he provided for this decision provide some additional basis for inferring

pretext.  When selecting individuals to recommend for the FSD vacancies, Loveridge discussed

candidates only with Leary and Ciatti.  Dkt. 38-2 at 14–15 (Def.'s SUMF ¶¶ 99, 105).  He did

not seek recommendations from FSD's only two Black supervisors, Bill Lewis and Edward

Alston.  Dkt. 46-1 at 101 (Pl.'s SUMF ¶ 59); Dkt. 50-1 at 40 (Def.'s Resp. Pl.'s SUMF ¶ 59).

Standing alone, that might merely raise an eyebrow, because, as the Secret Service points out,

Loveridge was not obligated to consult with all of the supervisors and, in fact, did not consult

with certain white supervisors.  Dkt. 50-1 at 40 (Def.'s Resp. Pl.'s SUMF ¶ 59).  But considered

along with the other evidence, a reasonable jury could find Loveridge's explanations less than credible and, having done so, could infer a purpose to favor white applicants.

Starting with Vacancy 17116, Loveridge testified at deposition that he did not consult with Lewis because Lewis was not a polygraph examiner, because Lewis lacked "technical credibility" on polygraphing, and because Lewis had been reassigned within FSD and was no longer supervising the polygraph program by the time selections were made for this vacancy. Dkt. 38-2 at 16–17 (Def.'s SUMF ¶¶ 112–15); Dkt. 40-2 at 51 (Loveridge Dep. 197: 10–22). A jury could question the first two of these explanations because they are at odds with how Loveridge otherwise characterized his priorities in the selection process. For example, he justified the selection of Hughes and Kistler over Fitzig primarily on the basis of qualities like leadership and managerial capabilities, not polygraph expertise. Dkt. 40-2 at 49 (Loveridge Dep. 189: 3–17; 191: 7–11; 192: 1–11); Dkt. 38-2 at 24 (Def.'s SUMF ¶ 159). That is fair enough. But if Loveridge was focused on assessing non-technical skills and leadership potential, a reasonable jury could find it implausible that Lewis's lack of technical polygraph proficiency was the reason Loveridge declined to seek his input.

The parties also dispute whether Lewis had in fact been reassigned at the time selections were made for Vacancy 17116. Dkt. 50-1 at 41–43 (Def.'s Resp. Pl.'s SUMF ¶¶ 61–62). Vacancy 17116 was filled on June 30, 2017, and the Secret Service maintains that Lewis left his supervisory role at FSD on June 19, 2017. Dkt. 38-2 at 17, 21 (Def.'s SUMF ¶¶ 115, 139). But in his declaration, Lewis says that he was Fitzig's supervisor "[a]t the time of the vacancy announcement/selection for [Vacancy] 17116" and that he was succeeded in his role by Leary "effective July 23, 2017"—nearly a month after the 17116 selections. Dkt. 46-4 at 2 (Lewis Decl. ¶¶ 2–4). To state the obvious, if Lewis had not yet been reassigned at the time of the

selection for this vacancy, stating that he had been reassigned is no justification for not consulting him.

To be sure, employers are not required to speak with every possible reference for candidates when making promotional decisions, and their failure to do so, standing alone, does not give rise to an inference of discrimination. But it is equally true that an employer may not avoid speaking with those in a protected class if the purpose of such avoidance is to impede the promotion of others in that class, presumably by excluding from the conversation those who might present a barrier to discriminatory decisionmaking. It may well be that nothing of the sort occurred here. But the combination of Loveridge decision to speak to only two, white FSD supervisors and failure to seek input from Fitzig's only Black FSD supervisor, *and* his arguably inconsistent or unsupported justifications for that choice could allow a reasonable jury to infer that these proffered reasons were pretextual.[5]

Although Lewis had been reassigned at the time Vacancies 17157 and 17165 were announced, by that time Alston had been promoted to a supervisory role and, viewing the evidence in the light most favorable to Fitzig, had become Fitzig's only Black supervisor. Dkt. 46-1 at 101 (Pl.'s SUMF ¶ 59); Dkt. 50-1 at 40 (Def.'s Resp. Pl.'s SUMF ¶ 59). When selecting who to recommend for these vacancies, Loveridge declined to consult with Alston just as he had declined to consult with Lewis. Dkt. 46-1 at 101 (Pl.'s SUMF ¶ 59); Dkt. 50-1 at 40 (Def.'s Resp. Pl.'s SUMF ¶ 59). Loveridge's explanation for not consulting Alston with respect to Vacancies 17157 and 17165 is not unreasonable: at the time of the selection for these vacancies, Alston had been a supervisor for approximately a month, so his perspective would not have been

_____

[5] The Court does not consider Loveridge's failure to speak with Alston relevant to Vacancy 17116, because Alston was not a supervisor at the time of selection for this vacancy. Dkt. 46-1 at 29 (Pl.'s Resp. Def.'s SUMF ¶ 116).

as informed as that of Leary and Ciatti.  Dkt. 40-2 at 31 (Loveridge Dep. 119:16–22, 120:1–19).

All the same—and when considered along with the other evidence—a reasonable jury might

disbelieve Loveridge's goldilocks approach to the only two Black FSD supervisors: Lewis was

on his way out, and Alston on his way in.  Although such a finding would lie close to the line of

reasonableness, the other evidence in the case provides it some ballast, as does the fact that,

although Alston had only recently been promoted at the time decisions were made for Vacancies

17157 and 17165, he knew Fitzig well, having served in the polygraph program for many years

by that time.  Dkt. 46-3 at 2 (Alston Decl. ¶¶ 2, 7).  Not every bit of evidence or inference is

equally compelling, and this is just one piece of the puzzle.  But a reasonable jury could find that

Loveridge's failure to seek input from Fitzig's two Black supervisors provides some support for

finding pretext.

This is a close case, and a jury need not infer pretext—and thus discrimination—from

any or all of the above.  But, drawing all inferences in Fitzig's favor, the Court concludes that a

reasonable jury could find that the Secret Service's rationale for declining to promote Fitzig for

the 17116, 17157 and/or 17165 vacancies was pretextual and that the real reason was his race or

color.  Fitzig, accordingly, has shown what he needs to show to survive summary judgment.

### ii.    *Vacancies 17209 and 17195*

The same is not true for Vacancies 17209 and 17195.  For these vacancies, Fitzig's case

turns almost entirely on relative qualifications arguments, and those arguments are no more

persuasive here than they were for the FSD vacancies just discussed.

As explained above, Vacancy 17209 was for an Assistant to the Special Agent in Charge

position in the Newark field office, and Special Agent Fagan was selected for the position.  Dkt.

46-1 at 72, 73 (Pl.'s Resp. Def.'s SUMF ¶¶ 294, 303).  Jenkins was the selecting official and

relied on the recommendation of Newark field office Special Agent in Charge McKevitt, transmitted via Breslin.  *Id.* at 73 (Pl.'s Resp. Def.'s SUMF ¶¶ 299–300).  McKevitt's explanation for selecting Fagan over Fitzig is that, in his view, Fitzig did not have "nearly as diverse a work history, nor the breadth or depth of leadership responsibilities" as did Fagan, in large part because Fitzig "had spent the most recent 9-10 years of his career as a polygrapher assigned to the [FSD]."  Dkt. 41–12 at 4 (McKevitt Decl. ¶ 32).

To rebut McKevitt's explanation, Fitzig once again points to what he believes to be his superior qualifications.  Dkt. 46 at 32–33.[6]  But Fitzig's credentials were "simply not discernibly better" than Fagan's, *Stewart*, 352 F.3d at 429, much less so superior that Fagan's selection raises the specter of discrimination.  Fitzig and Fagan were both senior special agents, and Fagan's tenure with the Secret Service was one year longer than was Fitzig's.  Dkt. 46-1 at 1, 75 (Pl.'s Resp. Def.'s SUMF ¶¶ 2, 313).  Fagan had worked in three field offices (Miami, West Palm Beach, and Newark) as compared to Fitzig's service in two (New York and Washington D.C.).  *Id.* at 1–2, 75, 76 (Pl.'s Resp. Def.'s SUMF ¶¶ 1, 3, 5–6, 312, 314–15, 317).  Both had been assigned to protect current or former presidents.  *Id.* at 2, 75 (Pl.'s Resp. Def.'s SUMF ¶¶ 4, 314).  No doubt Fitzig had significant leadership experience as a Group Leader in the New York Bank Fraud Squad, Field Office Lead Agent Assist, Airspace Program Whip, and Acting Assistant to the Special Agent in Charge in the Special Operations Division.  Dkt. 50-1 at 2–4, 5 (Def.'s Resp. Pl.'s SUMF ¶¶ 3–6, 8–9).  But Fagan had formidable leadership credentials too, having served on two occasions as Resident Agent in Charge of the West Palm Beach office.  Dkt. 46-1 at 75 (Pl.'s Resp. Def.'s SUMF ¶¶ 314–15).  It is true that Fitzig's MPP score was

---

[6] At one point Fitzig's brief labels this Vacancy 17195, but it is evident from the record that he is discussing Vacancy 17209.  Dkt. 39-6 at 11 (Def.'s Ex. 1).

higher than Fagan's.  Dkt. 41-10 at 1–2 (Def.'s Ex. 20).  But that fact standing alone—absent evidence that McKevitt, like Ciatti, disregarded MPP scores while purporting to consider the very same criteria based on his own, subjective assessment—is insufficient to give rise to a genuine dispute of material fact.

In focusing only on what he submitted were his superior qualifications, Fitzig also ignores what was assertedly most important to McKevitt: diversity and depth of experience.  Dkt. 41–12 at 4 (McKevitt Decl. ¶ 32).  Significantly, Fitzig concedes that he "did not have the same diversity of experiences or depth of experience as Fagan," Dkt. 46-1 at 76–77 (Pl.'s Resp. Def.'s SUMF ¶ 320), although, in the very next sentence, he denies that Fagan's "diversity or depth of experiences were *superior*," *id.* (emphasis added).  But, at least based on this record, that judgment is in the eye of the beholder.  Here, the relevant beholder is McKevitt—not Fitzig—and "[i]t is settled that it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (internal quotation marks and citation omitted)).  Nor is it the role of the Court or jury to second-guess an employer's assessment of which of the competing applicants' admittedly diverse and deep experience is "superior."  *See Aka*, 156 F.3d at 1294 (explaining that employers are entitled to make judgment calls respecting comparative qualifications).

In sum, both Fitzig and Fagan were experienced agents with excellent track records.  If there is any discrepancy in their qualifications, it is not obvious, and it falls well short of what is required to survive summary judgment.  Courts typically "will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision," *Stewart*, 352 F.3d at 430, and this Court will not do so here.

The story is similar for Vacancy 17195.  Recall that this vacancy was for two Assistant to the Special Agent in Charge positions in the Special Operations Airspace Security Branch and that Special Agents Desmond and Canfield were selected.  Dkt. 46-1 at 79, 80 (Pl.'s Resp. Def.'s SUMF ¶ 330, 340).  Buster and Habersaat, the officials principally involved in the selection process for these positions, say that they selected Desmond and Canfield over Fitzig because they believed that Desmond and Canfield had a greater diversity of experience than did Fitzig and, for that reason, had greater leadership potential.  Dkt. 46-1 at 82, 86–89 (Pl.'s Resp. Def.'s SUMF ¶¶ 350, 352, 371–80).

Fitzig's attempt to undermine this explanation by a comparison of qualifications is again unavailing.  As to Desmond, Fitzig points to the following evidence to show his superior qualifications.  First, Fitzig had two more years of experience than did Desmond.  *See id.* at 1, 83 (Pl.'s Resp. Def.'s SUMF ¶¶ 2, 355).  Second, Fitzig and Desmond both had experience in operations and protection.  *Id.* at 83 (Pl.'s Resp. Def.'s SUMF ¶ 356); Dkt. 39-8 at 10 (Def.'s Ex.1).  Third, although Desmond had been Whip and Acting Assistant to the Special Agent in Charge of the countersurveillance unit and Whip of Vice President-elect transition operations, Fitzig had served as the Airspace Program Whip, had been designated the Acting Assistant to the Special Agent in charge of that program, and had been both a Group Leader in the New York field office and a Backup in the Washington field office.  Dkt. 46-1 at 83 (Pl.'s Resp. Def.'s SUMF ¶ 358); *id.* at 110 (Pl.'s SUMF ¶ 113).  Fourth, Fitzig received a higher rating in the competency of "[t]echnical [p]roficiency" in his 2017 performance review that Desmond received in his 2016 performance review.  Dkt. 39-8 at 2 (Def.'s Ex.1); Dkt. 46-12 at 2 (Pl.'s Ex. 12).  Fifth, Fitzig had a higher MPP score.  Dkt. 39-7 at 31–32 (Def.'s Ex. 1).  Finally, Fitzig suggests that he had more airspace experience that Desmond, Dkt. 46 at 32, even though

Desmond spent three-and-a-half years in the Airspace Security Branch, while Fitzig had only two years of exposure to the airspace program through his PPD and Special Operations details, Dkt. 46-1 at 83 (Pl.'s Resp. Def.'s SUMF ¶ 356); Dkt. 42-5 at 2–3 (Fitzig Decl. ¶¶ 4–5).

Taken as a whole, this comparison merely establishes that Habersaat and Buster made a "judgment call" between two qualified candidates, something the Court has no warrant to override. *Aka*, 156 F.3d at 1294. Courts "must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone." *Stewart*, 352 F.3d at 430 (quoting *Aka*, 156 F.3d at 1294). Thus, "[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualification of the candidates." *Id.* This is a paradigmatic close case: Fitzig and Desmond had similar tenures, similar leadership experience, similar reviews, and similar exposure to the airspace program. In addition, Desmond had arguably completed a greater variety of assignments than had Fitzig. Over the course of his career, Fitzig had been a special agent in the New York field office, completed details on the PPD and in Special Operations, and worked as a polygrapher in the Washington field office. Dkt. 46-1 at 1–2 (Pl.'s Resp. Def.'s SUMF ¶¶ 3–6). Desmond, in contrast, had worked in both the Boston and Frankfurt offices and served in the Vice-Presidential Protective Division, International Programs Division, and the Airspace Security Branch. *Id.* at 83 (Pl.'s Resp. Def.'s SUMF ¶ 356). He had also been the Secret Service's representative on the FBI's Joint Terrorism Task Force. *Id.* (Pl.'s Resp. Def.'s SUMF ¶ 357). Fitzig's higher MPP score is not nothing. But in light of the record as a whole, it is not enough to establish that he was markedly more qualified than Desmond.

Fitzig compares more favorably to Canfield.  He had four more years of experience than she did, although they had many overlapping experiences: like Fitzig, Canfield had worked in both the New York and Washington field offices, spent time on the PPD, and served as a Backup in the Washington office.  *Id.* at 1–2, 84–85 (Pl.'s Resp. Def.'s SUMF ¶¶ 3–5, 363–64, 366).  Canfield had also worked in the White Plains resident office and on the Dignitary Protection Detail.  *Id.* at 84–85 (Pl.'s Resp. Def.'s SUMF ¶ 364).  Still, several other factors seem to favor Fitzig: he was a Senior Special Agent, and Canfield was not; he, unlike Canfield, had served as a whip; and he outscored her on the MPP.  Dkt. 46 at 31; Dkt. 39-7 at 31–32 (Def.'s Ex. 1).  Taken together, these facts could suggest that Fitzig was somewhat more qualified than Canfield in certain key respects.

But Fitzig cannot survive summary judgment simply by showing that he was more qualified than Canfield by some measures, including MPP score and years of experience.  "[C]ourts must be sensitive to the necessary and appropriate realities of hiring processes," and "[r]easonable employers . . . do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications."  *Jackson v. Gonzalez*, 496 F.3d 703, 709 (D.C. Cir. 2007) (internal quotation marks omitted).  For that reason, an employer "may select a candidate who on paper is *less qualified*" based on other factors, and doing so does not merit judicial suspicion unless the plaintiff is "significantly better qualified."  *Id.* (emphasis added) (internal quotation marks omitted).  Here, Fitzig was by no means *significantly* better qualified than Canfield.  *See Aka*, 156 F.3d at 1295–96; *Stoe*, 960 F.3d at 640–41; *Hamilton*, 666 F.3d at 1352–53; *Lathram*, 336 F.3d at 1092.  There is also ample evidence that Buster and Habersaat reasonably assigned value to qualities not captured by tenure and number of titles held.  For example, they considered it a strike against Fitzig that he had spent the last decade as a

polygraph examiner, Dkt. 46-1 at 87, 89 (Pl.'s Resp. Def.'s SUMF ¶¶ 374, 378), not an unreasonable determination given that Vacancy 17195 was for a non-polygraph role, *id.* at 89–90 (Pl.'s Resp. Def.'s SUMF ¶ 381); Dkt. 40-9 at 1, 4 (Buster Decl. ¶¶ 4, 24–25).  Canfield also received multiple recommendations from her supervisors for the position, whereas Fitzig did not. Dkt. 46-1 at 86, 89 (Pl.'s Resp. Def.'s SUMF ¶¶ 370, 379); Dkt. 41-2 at 4 (Habersaat Decl. ¶¶ 23–24).[7]  These are legitimate justifications for selecting Canfield over Fitzig, and Fitzig has not rebutted them.  And even if the Court agreed with Fitzig that Buster and Habersaat erred in how they weighed the various considerations, that would provide no basis for denying summary judgment: "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates."  *Fischbach*, 86 F.3d at 1183.

Fitzig's briefing makes no other arguments with respect to Vacancy 17195.  However, his response to the Secret Service's statement of undisputed material facts and his own statement of undisputed material facts gestures at several other potential bases for rejecting the Secret Service's justifications for promoting Desmond and Canfield.  By not even alluding to these issues in his briefing, Fitzig has forfeited any reliance on them.  Courts may deem forfeited any argument briefed "in conclusory fashion," *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 499 (D.C. Cir. 2015) (internal quotation marks omitted), a principle that applies *a fortiori* to arguments a party did not brief at all.  The Court also notes that Local Rule 7(e) restricts briefs to 45 pages, and parties may not evade this page limit by packing their at-times multi-hundred-page

---

[7] Although one might maintain that Fitzig's lack of a recommendation from his supervisor was arguably the result of discrimination by Leary, Ciatti, or Loveridge, Fitzig does not press this point, and, in any event, Fitzig was presumably free to ask any of his supervisors, including Alston, to submit a recommendation on his behalf.

statements of material facts and responses thereto with arguments they did not deem worthy of briefing.

But even if the Court were to consider these un-briefed arguments, its conclusion would remain the same. The Court will not review each argument that it might possibly divine from Fitzig's statement of material facts, but, instead, will focus on the most salient. The first such argument is Fitzig's suggestion that Canfield and Desmond received preferential treatment in the selection process from Assistant Special Agent in Charge Don Douglas. Dkt. 46-1 at 90 (Pl.'s Resp. Def.'s SUMF ¶ 382); *id.* at 112 (Pl.'s SUMF ¶ 121). As an initial matter, it is not clear that Douglas had any decisionmaking authority with respect to this vacancy or whether preferential treatment from him would have made a material difference. Regardless, as to Desmond, Fitzig merely asserts that Douglas and Desmond had a personal relationship; he does maintain that Douglas did anything at all to help Desmond secure a promotion. *Id.* at 90 (Pl.'s Resp. Def.'s SUMF ¶ 382); *id.* at 112 (Pl.'s SUMF ¶ 121). There is nothing improper about one employee having a personal relationship with a more senior employee, and no reasonable jury could think otherwise. Indeed, if anything, this contention cuts against Fitzig by offering a theory for Desmond's advance that, as framed by Fitzig, has nothing to do with Fitzig's race or color.

As for Canfield, Fitzig claims that she received an interview from Douglas for the role, whereas he (Fitzig) did not. *Id.* at 90 (Pl.'s Resp. Def.'s SUMF ¶ 382); *id.* at 112 (Pl.'s SUMF ¶ 121). Again, there is no evidence that Douglas had selection authority for this vacancy such that he would have been in a position to interview candidates. More significantly, Fitzig's evidence regarding the alleged interview is simply his own assertion that Canfield confirmed that she had such an interview when Fitzig asked about it, and his own statements about what several

41

unidentified "others" told him.  Dkt. 40-1 at 43 (Fitzig Dep. 169:9–25; 170:1–22); Dkt. 46-5 at 6

(Fitzig Dep. ¶ 16).  Fitzig's testimony about what Canfield and "others" allegedly told him is

hearsay and is not competent at summary judgment.  *Gleklen v. Dem. Cong. Campaign Comm.*,

199 F.3d 1365, 1369 (D.C. Cir. 2000); Fed. R. Civ. P. 56(c).   And even if Canfield had received

an interview for the position and Fitzig had not, that fact would not provide evidence of

discrimination based on Fitzig's race or color.  Fitzig does not suggest that the Secret Service

was required to interview every applicant for a vacancy, and, indeed, interviewing some

candidates but not others is unremarkable.

Fitzig also notes that Desmond had been the subject of a disciplinary action, presumably

to show that Desmond was less qualified for the vacancy than he was.  Dkt. 46-1 at 111–12 (Pl.'s

SUMF ¶¶ 117–21).  This argument fails as well.  Habersaat attests that he was unaware of this

incident, and there is no evidence to the contrary.  Dkt. 41-2 at 3 (Habersaat Decl. ¶ 18).  When

assessing an employment decision, "it is the perception of the decision maker which is relevant,"

*Vatel*, 627 F.3d at 1247 (internal quotation marks omitted), and a decisionmaker cannot be held

responsible for assessing the significance of facts of which he was not aware, *see Dodson v. U.S.

Capitol Police*, No. 18-cv-2680, 2022 WL 4598575, at *19–18 (D.D.C. Sept. 30, 2022).  And

Buster, who was aware of the discipline Desmond had faced, determined that it was a "minor

violation," which merely involved Desmond "forwarding an email from his work email to his

personal email that contained a link to an internal website."  Dkt. 46-1 at 90 (Pl.'s Resp. Def.'s

SUMF ¶ 383).  It therefore did not impact his decision to select Desmond.  *Id.*  That judgment

was reasonable and offers no basis to infer pretext.

Fitzig also argues that Buster and Habersaat's assessments of the candidates' relative

airspace-related experience were unsupported and pretextual.  This argument too lacks merit.

Any such contention with respect to Desmond can readily be rejected because, as already explained, undisputed evidence shows that Desmond had *more* airspace experience than Fitzig did. Dkt. 46-1 at 83 (Pl.'s Resp. Def.'s SUMF ¶ 356); Dkt. 42-5 at 2–3 (Fitzig Decl. ¶¶ 4–5). With respect to Canfield, Fitzig asserts that she had "no [a]irspace experience whatsoever" as compared to his two years of such experience, so the Secret Service's assertion that she was more qualified in this realm must be pretextual. Dkt. 46-1 at 89 (Pl.'s Resp. Def.'s SUMF ¶ 380); *id.* at 110 (Pl.'s SUMF ¶ 114). But his evidence for Canfield's lack of experience is his own conclusory assertion of the same. In fact, Buster attests in his declaration that "Canfield . . . had what [he] deemed to be the necessary amount of familiarity with airspace operations, as all agents assigned to PPD are exposed to airspace operations as they perform protective advances." Dkt. 40-9 at 3 (Buster Decl. ¶ 18). Habersaat also noted that Canfield was formerly a licensed pilot and was therefore knowledgeable about "aviation terminology, flight rules, aircraft capabilities, and Federal Aviation Administration (FAA) rules and procedures." Dkt. 41-2 at 4 (Habersaat Decl. ¶ 23); *see Vatel*, 627 F.3d at 1247 (noting that "it is the perception of the decision maker which is relevant" (internal quotation marks and citation omitted)). More generally, it is undisputed that Buster was not looking for candidates with maximal airspace expertise, merely "some familiarity with airspace operations in the protective context." Dkt. 46-1 at 82 (Pl.'s Resp. Def.'s SUMF ¶ 351). So even if Buster and Habersaat had concluded that Fitzig had more airspace experience than did Canfield, there is no reason to believe that would have impacted their selection. Finally, it does not appear that Buster was even aware of the full extent of Fitzig's airspace experience: he attests that he did not know what assignments Fitzig worked on during his eleven-month special operations detail, which, Fitzig contends, accounts for approximately half of his airspace-related work. Dkt. 40-9 at 3 (Buster Decl. ¶ 19). In a

perfect world, Buster might have further explored that question.  But a failure to exhaust every source of information and input in the promotion process is not evidence of discrimination.

In sum, Fitzig has failed to meet his burden of showing that a reasonable jury could find that the Secret Service's proffered rationale for failing to promote him to fill Vacancy 17209 or Vacancy 17195 was pretextual.

## B.    Retaliation Claim

Fitzig contends that the decisions not to promote him were not only discriminatory but also retaliatory.  Title VII prohibits employers, including federal employers, from retaliating against employees who make or support discrimination claims.  42 U.S.C. § 2000e–3(a); *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (applying § 2000e–3(a) to the federal sector).  The *McDonnell Douglas* framework, as modified by *Brady* and *Figueroa*, applies in the retaliation context.  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010).  To make out a prima facie case of retaliation, a plaintiff must show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Hamilton*, 666 F.3d at 1357 (internal quotation marks and citation omitted).  As explained above, the Secret Service has come forward with legitimate reasons for not promoting Fitzig.  The Court, accordingly, will not interrogate Fitzig's prima facie case and will instead move directly to the pretext analysis.  *Brady*, 520 F.3d at 494.

The Court can quickly dispense with Fitzig's retaliation claims related to Vacancies 17209 and 17195.  As explained above, Fitzig has failed to show that a reasonable jury could find that the Secret Service did not select him for these vacancies for discriminatory reasons. The same reasons that justify that holding apply to Fitzig's retaliation claim, and Fitzig has failed to present any additional evidence specific to retaliation.  So the Court concludes that no

reasonable jury could find that the decisions not to select him for these vacancies were retaliatory.

Before analyzing the FSD vacancies, the Court pauses to note that the conclusion that a reasonable jury could find that the Secret Service's stated rationales for not selecting Fitzig for these vacancies were pretextual and that the real reasons were discriminatory does not compel the same result for his retaliation claims. To be sure, in both the discrimination and retaliation contexts, adducing evidence that an employer's purported reasons for taking an action were pretextual will, at times, suffice to show that the actual reasons were either retaliatory or discriminatory, as the case may be. *See Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007). But surviving summary judgment on this basis for one kind of claim does not preclude summary judgment on the other; it is, of course, possible for an employer to discriminate without retaliating or to retaliate without discriminating. In cases where both discrimination and retaliation are alleged, the Court must evaluate the viability of each type of claim based on the record as a whole.

With that in mind, the Court concludes that summary judgment is appropriate as to Fitzig's retaliation claims related to the FSD vacancies. There is no competent evidence that most of the officials involved in the selection process for these vacancies were aware of Fitzig's prior EEO activity at the time of selection. To the contrary, most testified (without rebuttal) that they were unaware of it. And, of course, a supervisor cannot retaliate against an employee for engaging in protected EEO activity if the supervisor has no knowledge—directly or indirectly— of that activity. *Alvarado v. Donahoe*, 687 F.3d 453, 459 (1st Cir. 2012) ("[T]o successfully establish a claim of unlawful retaliation there must be, at a minimum, competent evidence that the alleged retaliators *knew* of the plaintiff's protected activity and that a retaliatory motive

45

played a part in the adverse employment actions alleged." (cleaned up) (internal quotation marks and citation omitted)); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (same); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (same); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (same); *see also Iyoha*, 927 F.3d at 574.  There is also no evidence that the only official who *was* aware of Fitzig's prior protected activity, Breslin, acted with any purpose to retaliate against him.  Thus, although a reasonable jury could doubt the justifications the Secret Service provided for not selecting Fitzig for the FSD vacancies, it could not take the further step and conclude that retaliation was the real reason.

Fitzig agrees with the Secret Service that he engaged in only two forms of protected or arguably protected activity: (1) he was named as a potential witness in a colleague's EEO case, although he never participated in the case, and (2) he contacted an EEO counselor in January 2017 and participated in "pre-complaint counseling" on an anonymous basis related to his non-selection for an earlier vacancy not at issue in this case. Dkt. 46-1 at 3, 5 (Pl.'s Resp. Def.'s SUMF ¶¶ 14–15, 20).  For present purposes, it is undisputed that no one involved in this case besides Breslin was aware that Fitzig was named as a potential witness in another employee's EEO case.  Fitzig concedes that he never told anyone about being named in the case, and he provides no evidence that Jenkins, Loveridge, Leary, or Ciatti were aware that he had been named, nor does he dispute their testimony that they were not aware he had been named.  *Id.* at 5 (Pl.'s Resp. Def.'s SUMF ¶ 22)*.*  Thus, no reasonable jury could find that anyone other than Breslin was motivated by a desire to retaliate against Fitzig for this activity.  *See Alvarado*, 687 F.3d at 459.

Similarly, Fitzig has not shown that any official other than Breslin who was involved in the FSD vacancy selection process was aware of his own EEO proceedings.  The Secret Service

has carried its initial summary judgment burden on this score by providing testimony from Jenkins, Loveridge, Ciatti, and Leary attesting that they were unaware of Fitzig's protected activity at the time they decided who to recommend for the FSD vacancies. Dkt. 40-2 at 49–50 (Loveridge Dep. 192: 20–22; 193:1–22; 194: 1–6); Dkt. 40-7 at 2 (Leary Decl. ¶¶ 13–15); Dkt. 40-8 at 2–3 (Ciatti Decl. ¶¶ 11–12); Dkt. 41-1 at 2–3 (Jenkins Decl. ¶ 15); Dkt. 39-4 at 22–23 (Jenkins EEO Decl. ¶¶ 14, 19).  Although Fitzig contends that he has evidence to the contrary, he offers nothing other than his own speculation.

Fitzig's account of how his supervisors learned of his protected activity centers on Jenkins, but it is far too speculative to give rise to a genuine dispute of material fact.  Fitzig maintains that he received a suspicious email allegedly from the Washington Post, which he reported to the Secret Service. Dkt. 39-3 at 33 (Fitzig Jenkins Rebuttal Decl. ¶ 7).  In response, Secret Service inspectors apparently interviewed him about the incident and subjected him to a polygraph examination regarding the veracity of his responses.  *Id.*  The inspectors also informed him that his official work emails had been reviewed as part of the investigation.  *Id.*  Jenkins was briefed on the result of this investigation, which cleared Fitzig of any improper activity.  *Id.*; Dkt. 46-5 at 2 (Fitzig Decl. ¶ 7).

Based on these facts, Fitzig asks the Court to accept the following causal chain: because his emails were reviewed in this investigation, and because his email account contained correspondence related to his EEO activity, the investigators may have read those emails, may have learned about his EEO activity, and then, may have briefed Jenkins on the topic of Fitzig's suspect media contacts and, in the course of doing so, may have told Jenkins that Fitzig had engaged in EEO activity.  Dkt. 39-3 at 33 (Fitzig Jenkins Rebuttal Decl. ¶ 7); *see also* Dkt. 46-5 at 2 (Fitzig Decl. ¶ 7).  This is beyond speculative.  Fitzig has presented no evidence that the

review of his work emails in fact uncovered his EEO activity nor that in briefing Jenkins on an unrelated matter, the investigators informed Jenkins as an aside that Fitzig had previously engaged in informal EEO counseling. Fitzig's hypothesis that all these events occurred does not create a genuine dispute of material fact. *Anderson*, 477 U.S. at 249–50 (explaining that if the non-moving party's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted" (internal citations omitted)).

Fitzig's support for his contention that Loveridge, Leary, and Ciatti were aware of his prior protected activity is, if anything, even weaker. He principally relies on the same suppositions just discussed. Dkt. 46-1 at 94 (Pl.'s SUMF ¶¶ 14–16). Because this theory was insufficient to create a genuine dispute of material fact even as to Jenkins, it follows that Fitzig's theory fails as to Loveridge, Leary, and Ciatti. Fitzig does not maintain that any of these officials was even briefed on the unrelated investigation, and he fails to explain or even to hypothesize how the information that he posits was obtained from his emails ever reached them.

Fitzig offers one additional and unrelated piece of evidence with respect to Loveridge, but that too falls short. He contends that he met with Loveridge to discuss why he did not receive a particular promotion, and during this conversation "Loveridge was put on notice about [his] protected activity." *Id.* at 49 (Pl.'s Resp. Def.'s SUMF ¶ 201). But his evidence for this assertion is a declaration in which he recounts this conversation, and the declaration does not say that he apprised Loveridge of the informal EEO counseling in which he had engaged related to previous non-selections. Dkt. 39-4 at 1 (Fitzig Loveridge EEO Rebuttal Decl. ¶ 48). There is therefore no factual dispute about whether Loveridge was aware of Fitzig's EEO counseling.

That leaves Breslin. And although Breslin was aware of Fitzig's protected activity, there is no evidence in the record that he acted with retaliatory animus in not overruling the

recommendations of Loveridge, Leary, and Ciatti regarding candidates for the FSD vacancies. In fact, Fitzig does not even dispute Breslin's assertion that he did not consider Fitzig's protected activity when making his recommendations.  Dkt. 46-1 at 47, 58–59, 70 (Pl.'s Resp. Def.'s SUMF ¶¶ 196, 236, 290); *see also* Dkt. 39-4 at 40, 42, 44 (Breslin EEO Decl. ¶¶ 19, 33, 47). Thus because the only official involved in the selection process for the FSD vacancies who was aware of Fitzig's protected activity concededly did not consider that activity in making his recommendations, Fitzig's retaliation claims with respect to these vacancies cannot go forward.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant's motion for summary judgment, Dkt. 38, is **GRANTED** in part and **DENIED** in part.  Summary judgment is **DENIED** as to Fitzig's discrimination claims related to Vacancies 17116, 17157, and 17165 and is otherwise **GRANTED.**

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 24, 2023